Argued and submitted March 11, reversed in part and affirmed in part on appeal and cross-appeal July 28, 1999

David TIFFT,
individually and on behalf of
Vision Plastics, Inc.,
and Vision Plastics, Inc.,
an Oregon corporation,
*Respondents - Cross-Appellants,*

*v.*

Ronald STEVENS
and Stevens Tool & Die, Co.
*Appellants - Cross-Respondents.*
(9511-08674; CA A96357 (Control))

VISION PLASTICS, INC.,
an Oregon corporation,
*Cross-Respondent,*

*and*

Ronald STEVENS,
*Appellant - Cross-Respondent,*

*v.*

David TIFFT,
*Respondent - Cross-Appellant.*
(9601-00118; CA A96358)
(Cases Consolidated)

987 P2d 1

Jacob Tanzer argued the cause for appellants - cross-respondents Ronald Stevens and Stevens Tool & Die, Co. With him on the briefs were Ball Janik LLP and James L. Buchal and Murphy & Buchal LLP.

Barnes H. Ellis argued the cause for respondent - cross-appellant David Tifft. With him on the briefs were Charles F. Adams, Scott E. Crawford, and Stoel Rives LLP.

Mark M. McCulloch argued the cause for cross-respondent Vision Plastics, Inc. With him on the brief was Powers McCulloch & Bennett LLP.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

In the first of these consolidated cases, plaintiff David Tifft, both personally and derivatively as a shareholder of Vision Plastics (Vision), sued Ronald Stevens and Stevens Tool & Die Co.,[1] claiming corporate oppression of a minority shareholder, ORS 60.661,[2] breach of fiduciary duty, and breach of a shareholder buy-sell agreement (the oppression case). In the second case, Ronald Stevens and Vision sought damages and injunctive relief against Tifft for alleged breach of the noncompetition and nonsolicitation provisions of the same shareholder buy-sell agreement (the M4U case). Both consolidated cases were decided in a bench trial in which the court generally found that Stevens had oppressed minority shareholder Tifft and also found that Tifft had violated noncompetition and nonsolicitation provisions of the shareholder buy-sell agreement. We discuss the court's rulings on the various claims in more detail below.

Stevens appeals in both cases, asserting that the trial court erred in denying his motion to dismiss Tifft's claims and in ordering Stevens to buy out Tifft's shares. Stevens further asserts that the trial court erred in rejecting his argument that Tifft's claims were barred by waiver and estoppel. Stevens also contends that the trial court erred in failing to dismiss Tifft's claim for breach of fiduciary duty against Stevens Tool & Die, as opposed to Stevens individually, and in entering judgment against Stevens Tool & Die on that claim. Finally, Stevens takes issue with the trial court's award of attorney fees to Tifft in the oppression case and in its denial of attorney fees to Stevens in the M4U case.

Tifft cross-appeals in both cases, arguing that the trial court erred in determining his damages in several respects in the oppression case and in denying his motion for leave to amend his complaint to seek prejudgment interest.

---

[1] Stevens and Stevens Tool & Die are referred to generically as Stevens throughout this opinion, except where arguments specifically pertain only to Stevens Tool & Die.

[2] ORS 60.661 provides for judicial dissolution or forced buyout of shares in a corporation under various circumstances, including situations where the "directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent[.]" ORS 60.661(2)(b).

In the M4U case, Tifft contends that the trial court erred in finding that he had breached the agreement and in awarding Vision $15,999.19 in damages. He further argues that the trial court erred in awarding attorney fees to Vision on that claim.

In its response to Tifft's cross-appeal in the M4U case, Vision attempts to raise in cross-assignments of error issues concerning the trial court's rulings that Tifft did not breach a fiduciary duty to Vision and that Vision was estopped from pursuing certain claims against Tifft.[3] However, neither of those subjects may properly be cross-assigned as error. *See generally* ORAP 5.57(2) (cross-assignment of error may not seek to reverse or modify the judgment on appeal). We therefore do not consider Vision's cross-assignments of error.

■■■ On the equitable corporate oppression claims, we "try the cause anew upon the record." ORS 19.415(3).[4] On the legal claims for breach of contract, we review for errors of law. The facts set out below are as we find them on *de novo* review of the equitable claims and as supported by evidence in the record on the legal claims.

In 1988, Tifft and Gary Jarmusch wanted to start a plastic molding injection company but needed financing, so they approached Stevens, the owner of Stevens Tool & Die.[5] Tifft, Jarmusch and Stevens formed Vision: Stevens held 51 percent of the stock while Tifft and Jarmusch each held 24.5 percent of the stock. Tifft and Jarmusch worked full time for Vision, while Stevens continued to work primarily at Stevens Tool & Die. Tifft, Jarmusch and Stevens entered into a stock

---

[3] Vision's brief also makes reference to its "cross-appeal" at certain points. However, Vision filed no notice of cross-appeal in the M4U case.

[4] Stevens suggests in several footnotes in his opening brief that, in trying the case "anew upon the record," this court should consider evidence offered but not received by the trial court. Stevens does not assign error to the court's exclusion of the evidence in question and cites no authority for the proposition that an appellate court, in reviewing an equitable claim, may consider evidence that the trial court ruled inadmissible. We reject Stevens' contention without further discussion.

[5] Stevens Tool & Die makes molds that are used in manufacturing parts; Vision uses molds made by Stevens or other toolmakers to actually produce parts.

buy-sell agreement that made the following provisions pertaining to Vision stock:

"4. *Disposition of Stock During Lifetime.* In the event any of the parties hereto during his or her lifetime shall desire to sell any portion or all of his capital stock of Corporation, and shall not have received the prior written consent of all of the other parties to this agreement, he may sell the same only after offering it to the other parties hereto in the following manner:

"(a) The party desiring to sell all or part of his shares shall give notice to the other parties, indicating that he has a bona fide offer for the sale of his shares stating the number of shares to be sold, the name and address of the person desiring to purchase the shares, and the sales price and terms of payment of such sale; such notice shall also contain an offer to sell such stock to the other parties to this agreement upon the terms and conditions as set forth in the aforesaid bona fide offer of sale, and shall also include a copy of all documents setting forth such offer of sale.

"(b) No party hereto shall present to the other parties hereto such notice of offer for the sale of his shares unless the person desiring to purchase the shares has made a bona fide offer for purchase of the stock of the offering shareholder and has paid to said shareholder earnest money on said purchase equal to five percent (5%) of the offered price.

"(c) For a period of thirty (30) days after the mailing of such notice, Corporation shall have the option to redeem all, but not less than all of the stock so offered. Within such time period, Corporation shall give notice to the other parties hereto of Corporation's exercise of its option. If Corporation fails to exercise such option, the other parties to this agreement shall each have a separate option to purchase all but not less than all, of such offered shares in amounts proportionate to such parties' respective share ownership. The other parties hereto shall have such options to purchase the shares for a period of fifteen (15) days after the termination of Corporation's option to redeem. The election to purchase shall be exercised by notice to the other parties hereto. The price to be paid by the other parties hereto shall not exceed the fair market value, as determined pursuant to paragraph 6(b).

"* * * * *

"5. *Payment of the Purchase Price*. The purchase price for all shares sold or redeemed pursuant to paragraph 4 shall be paid in full at closing; provided, that in the event the purchase price exceeds the sum of One Hundred Thousand Dollars ($100,000.00), such purchase price shall be paid as follows:

"Ten percent (10%) of the purchase price on closing, and the balance in 60 equal monthly installments, including interest on the unpaid balance at the rate of nine percent (9%) per annum from the date of closing, said installments to commence one month after the date of closing. The purchaser of the shares shall have the right to prepay any additional portion or all of the balance owing, without penalty.

"* * * * *

"6(b) The purchase price of the deceased shareholder's stock purchased hereunder shall be the fair market value as last determined by the parties hereto immediately preceding the date on which said shareholder shall have died, subject to subparagraph (e) hereof. Unless altered as herein provided, it is mutually agreed that the purpose of determining the purchase price to be paid for the deceased shareholder's stock, the fair market value of each share of stock including good will is, as of the date of this agreement, $100 per share [revised upward to $5,000 per share in December 1994].

"(c) The parties hereto may redetermine the value of the stock at any time upon unanimous consent, and shall redetermine the value of stock within 45 days following the end of each fiscal year. * * *"

The same agreement also contained several noncompetition clauses:

"22. *Noncompete*. Without the express prior written consent of all shareholders of the corporation, no shareholder shall, directly or indirectly, render services to or for the benefit of, engage in or operate, manage, own, or have any other interest in, or perform any services to, for or on behalf of any person, firm, or corporation or business that engages in any activity engaged in by the Corporation. Such restrictions shall be effective during the term of this agreement, any renewals hereof, without geographical limitation. Such restrictions shall be effective after the termination of this

agreement for any reason whatsoever, for a period of three (3) years from said termination, and shall apply, with respect to the following geographical areas: The states of Oregon and Washington. Notwithstanding the foregoing, such restrictions shall not be effective (a) after the termination of this agreement, in the event that the Corporation declines to exercise its repurchase right pursuant to paragraph 17 hereof, nor (b) with respect to any business activities which are the same as or similar to those conducted by Ronald Stevens, *dba* Stevens Tool & Die, on the effective date hereof.

"* * * * *

"24. *Nonsolicitation.* Each party hereto acknowledges that the Corporation has developed or will develop profitable and potentially profitable business relationships with certain individuals and business entities. Each party therefore agrees that, for the period during which this Agreement is in effect, and for an additional period of 3 years thereafter, no party hereto will solicit or accept, directly or indirectly, business relations with any individual or business entity with which the Corporation then currently has business relations, including but not limited to actual or prospective customers, clients, employees or sales representatives. Notwithstanding the foregoing, such restrictions shall not apply with respect to any business activities which are the same as or similar to those conducted by Ronald Stevens, *dba* Stevens Tool & Die, on the effective date hereof."

Another provision of this agreement concerned corporate decisionmaking:

"25. *Voting Requirements.* Notwithstanding the Articles of Incorporation, the bylaws or any rule of law or statute to the contrary, the actions listed below may not be taken by the Corporation, board of directors, officers, employees or shareholders, and shall be null and void, unless approved by holders of at least seventy percent (70%) of the outstanding shares of the Corporation; each party hereto does agree to vote all shares for which that party is entitled to vote, in order to give effect to this paragraph:

"(a)   Change of terms of compensation including benefits, for corporate officers and directors;

"(b)   Elect *or remove corporate officers or directors;*

"* * * * *

"(d)   Except in the ordinary course of business, expend corporate funds in excess of $100,000.00 with respect to any single transaction, or incur corporate obligations in excess of that amount, or make any tax elections."

In June 1988, the three shareholders met and elected themselves to serve on Vision's board of directors. The corporation adopted bylaws that provided, in pertinent part, that officers would be elected by the board of directors and could be removed from office for cause by a majority vote of the directors and that the salaries of all officers would be fixed by the board of directors and could be changed by a majority vote of the board. Stevens became president, Tifft became vice-president, and Jarmusch became secretary/treasurer.

In 1989, Vision issued additional stock that was purchased by Stevens and Tifft, after which Stevens owned 61 percent of the stock, Tifft owned 24 percent, and Jarmusch owned 15 percent. By 1990, the company had become quite successful, and Stevens began working full time at Vision rather than at Stevens Tool & Die. Through the early 1990s, the board made decisions regarding compensation for Tifft, Jarmusch and Stevens, as well as bonuses, apparently without serious disagreement.

Also in 1989, a Vision customer discussed with Tifft the possibility of designing a new plastic part. Tifft met with Stevens and Jarmusch to discuss this possibility, but they did not want Vision to get involved in parts design because of the liability risks involved. They did, however, agree that Tifft individually could pursue the possibility. Tifft created a company, M4U, to do design work. M4U tested its molds at Vision, with Stevens' assistance and cooperation. Vision then manufactured the part that M4U had designed. Jarmusch was pleased that M4U had generated business for Vision.

By 1991, Vision had outgrown its leased space, and Tifft, Jarmusch and Stevens all agreed that the company should look for new leased space. Tifft and Jarmusch felt that 20,000 square feet would be adequate, and Stevens agreed to look for new space. Stevens later informed Tifft and

Jarmusch that he planned to build a 40,000-square-foot building himself and lease it to Vision for $10,500 per month. After Vision moved into the new space, Jarmusch signed a lease with Stevens for a monthly rate of $14,047 per month. No vote was taken by the board regarding this lease, which contained numerous provisions that were quite beneficial to lessor Stevens and detrimental to lessee Vision regarding repairs, deposits, and various other matters, including restrictions on subletting and use.

In 1992, Tifft, Jarmusch and Stevens agreed to change Vision from a subchapter C corporation to a sub-chapter S corporation, making each shareholder personally responsible for his share of the corporation's taxable income; they agreed at the same time that Vision would fund those taxes.

Until that time, Vision had focused its production on small parts, and Jarmusch and Tifft did not plan to expand Vision to manufacture large parts. About that time, Stevens personally acquired a Toshiba press for making large parts and agreed with Jarmusch that the press be placed at Vision and that Vision would pay Stevens $25 per hour for its use. As the large parts business grew, Vision acquired several large presses of its own, but Stevens' Toshiba press also continued to be used, although at times one of Vision's own large presses remained idle.

In late 1994, tension developed among Tifft, Jarmusch and Stevens over various proposed changes to the buy-sell agreement. Basically, Stevens wanted to create non-voting stock, apparently for estate planning purposes, and wanted to require life insurance for each of the shareholders; Jarmusch wanted the ability to liquidate his shares; and Tifft wanted to revise the buy-sell agreement to provide that his M4U business did not violate the noncompete provisions. Around that time, Stevens met with a financial consultant to consider ways to get Tifft and Jarmusch to agree to his suggestions. Among the ideas they came up with was threatening enforcement of the noncompete/nonsolicitation clauses of the buy-sell agreement, but a memo noted a disadvantage of that strategy: "May create dissension [sic] and hinder ability to arrive at a new agreement." This memo also suggested the

possibility of eliminating the distributions to the shareholders to fund subchapter S taxes in order to force Tifft and Jarmusch either to pledge their shares or file for bankruptcy, so Tifft and Jarmusch would have to sell their shares to Stevens at the price predetermined by the buy-sell agreement. Shortly thereafter, Jarmusch sent a memo to Stevens, who controlled Vision's line of credit, seeking to fund the subchapter S taxes of the shareholders. Stevens indicated that he would not agree to fund the subchapter S taxes.

Through early 1995, Tifft, Jarmusch and Stevens continued to negotiate about amendments to the buy-sell agreement but failed to reach agreement, and Stevens began to strategize ways to remove Jarmusch from the company without having Vision's board involved, as he believed that Tifft would side with Jarmusch and outvote him. In May 1995, Jarmusch went to Hawaii, allegedly for a trade meeting, and billed the cost of his trip to Vision. Stevens verified that Jarmusch had not attended the trade meeting, then fired him and removed him from the board of directors without the consent of Vision's board.

At a director's meeting thereafter, Tifft and Jarmusch, as a majority of the board, voted to reinstate Jarmusch's compensation. (By that point, Stevens apparently had conceded that he did not have the ability to unilaterally remove Jarmusch from the board.) Tifft and Jarmusch also voted for Vision to fund a subchapter S reserve to cover taxes, to develop procedures governing transactions between Vision and Stevens Tool & Die, and to review past transactions between Vision and Stevens Tool & Die in light of an audit that had turned up certain irregularities.[6]

---

[6] Many of the molds used by Vision were made by Stevens' company, Stevens Tool & Die. Tifft, Jarmusch and Stevens originally agreed that the making of molds would be bid competitively and at least three bids would be required before a job would be awarded to a toolmaker. After Stevens began working at Vision full time, a number of jobs were awarded to Stevens Tool & Die without competitive bidding or were awarded to Stevens Tool & Die although it was not the lowest bidder. At least one record appears to have been falsified to reflect that the bid of one of Stevens Tool & Die's competitors was higher than the bid actually made. Stevens Tool & Die then subcontracted some of the work it received from Vision to other toolmakers at a lower cost and kept the difference.

Stevens refused to carry out any of the board's directives but, instead, called a shareholder's meeting and voted as the majority shareholder to overrule all of the board's recent directives and to empower himself as president to terminate other officers, to prohibit subchapter S reserves to cover taxes, and to limit bylaw amendments to those enacted by the majority shareholder.

In October 1995, Jarmusch went to work for a Vision customer that planned to do some of its molding work in-house. Stevens, without the cooperation of Tifft, filed suit on behalf of both himself and Vision against Jarmusch for breach of the buy-sell agreement. Stevens, through his attorney, then approached Jarmusch and proposed that he buy Jarmusch's stock and that they settle the litigation, which, at that point, involved a claim or claims by Jarmusch against Stevens or Vision as well as Stevens' claim against Jarmusch. Stevens' proposal provided that Jarmusch would resign, that Stevens would buy Jarmusch's stock for $13,000 per share, that Stevens would comply with the board of directors' directive to reinstate Jarmusch's salary and benefits, and that Stevens would agree not to enforce the noncompetition and nonsolicitation provisions of the buy-sell agreement against Jarmusch.

The agreement ultimately reached between Stevens and Jarmusch made similar provisions and further provided that Stevens would offer $13,000 per share for Jarmusch's stock, that Stevens and Jarmusch would vote that Vision not exercise its option to acquire the stock pursuant to the buy-sell agreement, and that Jarmusch would refuse to sell to Tifft for the $5,000 per share price then listed in the buy-sell agreement. Stevens and Jarmusch further agreed that they would first attempt to revise the price in the buy-sell agreement upward to $13,000 per share by calling a "valuation meeting," and that, if Tifft would not agree to the redetermination at that price, Jarmusch would not oppose Stevens' position that only a 70 percent vote of the shareholders was required to redetermine the value of the stock.

Thereafter, Stevens and Jarmusch carried out the terms of their agreement. First, Stevens called a meeting in early 1996 seeking to redetermine share value at $13,000 per

share. Tifft opposed the change in share price. Stevens, through his wife, offered to buy Jarmusch's stock, and Stevens then called a board meeting, ostensibly to give Vision the option to redeem the stock pursuant to the buy-sell agreement. Stevens and Jarmusch, pursuant to their private agreement, both voted for Vision not to redeem the stock. Also pursuant to the private agreement, Jarmusch refused to sell to Tifft at the $5,000 price stated in the buy-sell agreement and sold all of his stock to Stevens at the price agreed on in their private agreement.

Thereafter, Stevens refused to pay Tifft any bonuses, excluded him from decisionmaking, and limited his access to the company car. Tifft eventually resigned, and the present litigation ensued.

The trial court ultimately ruled that Stevens, as the majority shareholder, had acted oppressively and that the court had jurisdiction over Vision pursuant to ORS 60.661.[7] The court determined that the proper equitable remedy was to order Stevens to buy out Tifft's shares for an aggregate purchase price of $2,065,455. Specifically, in the oppression case, the court found: that Stevens had engaged in self-dealing transactions between Vision and Stevens Tool & Die that were unfair to Vision; that the terms of Stevens' lease of the building to Vision was unfair to Vision; that Stevens' ownership of the Toshiba press that he rented to Vision both violated the noncompete provisions of the buy-sell agreement and competed with Vision, thus causing damage to Vision; that Stevens used his financial control over the subchapter S distributions in a manner that was oppressive to the minority shareholders and that was not in the best interests of Vision; that Stevens' withholding Tifft's bonuses and limiting Tifft's use of the company car also were oppressive and not in the best interests of Vision; that Stevens' unilateral termination of Jarmusch and his secretly negotiated settlement with Jarmusch were undertaken for Stevens' personal interest and with personal animus toward Jarmusch and Tifft, were not in the best interest of Vision, and caused harm to Vision.

---

[7] We discuss only the aspects of the trial court's decision that are implicated on appeal.

On Tifft's derivative claim for breach of fiduciary duty, the trial court found that Stevens had breached his fiduciary duty to Vision by engaging in the self-dealing transactions with Stevens Tool & Die set forth above but that Stevens nonetheless should prevail on this claim because any damage award to Tifft would be, in essence, a windfall, because he had acquiesced in Stevens' conduct. However, the court did find that Stevens Tool & Die had profited unfairly from Stevens' conduct and granted judgment against Stevens Tool & Die in favor of Vision for $5,750.

On Tifft's claim for breach of contract concerning Stevens' actions relating to his acquisition of Jarmusch's stock, the court found that there was a breach of contract, that Stevens' actions were in his self-interest, and that the corporation lost its opportunity to redeem the Jarmusch stock at a low price. The court further found that there was no actual damage to Vision in light of the fact that it was ordering Stevens to buy out Tifft's stock, leaving Stevens the sole owner of Vision.

Regarding Tifft's claim that he personally was harmed by Stevens' and Jarmusch's collusion to deprive him of his opportunity to purchase a portion of Jarmusch's shares, the trial court found against Tifft on the ground that he had not made a sufficient tender to purchase the Jarmusch stock pursuant to the buy-sell agreement.

On Tifft's direct action against Stevens for breach of the buy-sell agreement, the court held that there was no breach in respect to the purchase of the Jarmusch stock, again because Tifft's tender for the portion of the stock to which he was entitled was insufficient. As to Tifft's claim that Stevens had breached the noncompete provisions of the buy-sell agreement, the court concluded that Tifft had not established a breach because he himself was in breach of the same provision. The court found that Stevens had breached the buy-sell agreement by unilaterally terminating Jarmusch without the approval required by the agreement and also had breached the officer compensation provision of the agreement by withholding Tifft's 1995 bonus. Despite the findings of breach, however, the court declined to award any damages on the contract claim, apparently on the theory that it was

Vision, rather than Stevens, that should be liable for the damages to Tifft, and Vision was not a defendant. However, the court did find that Tifft was entitled to recover attorney fees pursuant to the agreement for Stevens' breach.

On Stevens' and Vision's claims against Tifft for breach of the noncompetition provisions of the buy-sell agreement, the trial court concluded that Tifft had violated the agreement, that he should be enjoined from further violations but that damages were not in order for most of M4U's actions because Stevens had acquiesced in Tifft's M4U business. The court found, however, that Vision was entitled to damages concerning one of M4U's transactions because it had occurred at a time when Stevens had begun to threaten to enforce the noncompetition provision of the buy-sell agreement. The court concluded that Vision was entitled to damages of $15,999 and attorney fees on that claim.

■ We begin with the mirror image claims in Stevens' and Vision's action against Tifft for breach of the noncompetition provisions of the buy-sell agreement and in Tifft's action against Stevens on the same matter, because they present the most straightforward issues in this case. As noted above, the trial court found that Stevens' rental of the Toshiba press to Vision had violated the noncompetition provisions of the agreement and that various aspects of Tifft's M4U business had also violated those provisions.

On appeal, Stevens appears to contend that he prevailed on Tifft's breach of contract claim against him for breach of the buy-sell agreement because the trial court did not award Tifft damages on this claim separate from the remedy that Tifft received on his oppression claim. Tifft argues that he prevailed on that claim against Stevens and further contends that the trial court erred in finding that he had violated the noncompetition provisions of the buy-sell agreement. As set forth above, the trial court clearly did conclude that both Tifft and Stevens had violated the noncompetition provisions of the buy-sell agreement. Tifft, Stevens and Vision all have argued that various theories of waiver and estoppel should preclude the other's claims relating to breach of the agreement. For the following reasons, we agree.

■ Under the facts of this case, it is clear that Stevens, as defendant in Tifft's claim for breach of the noncompete

provision, and Tifft, as defendant in Steven's and Vision's claim for breach of the same provision and the nonsolicitation provision (as well as the various equitable claims relating to the same subject matter), have prevailed on their defenses of waiver and estoppel. Waiver involves "an intentional relinquishment of a known right." *Bennett v. Farmers Ins. Co.*, 150 Or App 63, 74, 945 P2d 595 (1997). In circumstances such as these, the terms "waiver" and "estoppel" often are used in much the same sense, to "preclude[ ] someone from exercising a right to another's detriment if the right holder, through words or conduct, has led the other to believe the right will not be exercised." *Daly v. Fitch*, 70 Or App 18, 21 n 2, 687 P2d 1124 (1984). As noted above, Tifft was fully aware of the use of Stevens' Toshiba press for Vision jobs as early as 1992, and it is clear that Vision, as well as Stevens, profited from the use of that press. Likewise, Stevens and Vision not only were aware of Tifft's M4U design activities but Stevens actively assisted Tifft in testing molds at Vision in the early 1990s. Again, Vision profited from the M4U activities because it generated manufacturing business for Vision.

Although both Stevens and Tifft, in retrospect, have asserted that they did not really wholeheartedly approve of the other's activities, the record establishes otherwise. Both Stevens and Tifft acquiesced in the other's technical violations of the noncompete or nonsolicitation provisions because those technical violations were not harming Vision and were, in fact, helping Vision generate business and increase profits. It was not until the parties started battling over the management of Vision and their share ownership that threats to enforce the terms of these provisions started to surface. At that point, both Stevens and Tifft had been openly violating the provisions for years, with each others' and Vision's acquiescence, if not outright support. Under the circumstances, the noncompete provisions are not enforceable against either Stevens or Tifft. We conclude that the trial court erred to the extent that both Stevens and Tifft violated the noncompete or nonsolicitation provisions and in holding that Tifft should be enjoined and should pay damages and attorney fees to Vision on its claim for breach.

■ As did the trial court, we take a holistic approach to the claims of corporate oppression and breach of fiduciary duty, as they are intertwined in essential ways, because a

finding that a party has breached a fiduciary duty often equates to a finding that the party has engaged in oppressive conduct. *Chiles v. Robertson*, 94 Or App 604, 639-40, 767 P2d 903, *on recons* 96 Or App 658, 774 P2d 500, *rev den* 308 Or 592 (1989). To the extent that Tifft is arguing that breaches of fiduciary duty are separately actionable and therefore require separate awards of damages, we agree with the trial court that the breach of fiduciary duty claims are essentially subsumed under the oppression claim, given the nature of the buyout remedy involved. As noted above, Stevens argues that the trial court erred in failing to direct a verdict in his favor on these claims, in rejecting his waiver defense and in finding for Tifft, and in ordering Stevens to buy out Tifft's shares. On cross-appeal, Tifft argues that the trial court should have awarded additional damages and should have allowed him to amend his complaint to seek prejudgment interest.

■ Under ORS 60.661, a court in equity may dissolve a corporation or order other equitable relief if it finds that those in control of the corporation have acted illegally, oppressively or fraudulently. *See generally Delaney v. Georgia-Pacific Corp.*, 278 Or 305, 325, 564 P2d 277 (1977); *Baker v. Commercial Body Builders*, 264 Or 614, 631-32, 507 P2d 387 (1973). Oppressive conduct has been described as

> "burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of a company to the prejudice of some of its members; or a visual departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely." *Id.* at 628 (citation and internal quotation marks omitted).

Similarly,

> "[w]hen the majority shareholders of a closely held corporation use their control over the corporation to their own advantage and exclude the minority from the benefits of participating in the corporation, absent a legitimate business purpose, the actions constitute a breach of their fiduciary duties of loyalty, good faith and fair dealing." *Noakes v. Schoenborn*, 116 Or App 464, 471-72, 841 P2d 682 (1992).

Although the standard for "oppressive conduct" has been described as "nebulous," *Weiner Investment Co. v. Weiner*, 105 Or App 339, 343, 804 P2d 1211 (1991), and presents difficult issues in many circumstances, we do not find that this is a close case. Leaving aside the issues concerning Stevens' profits from renting the Toshiba press to Vision and in leasing space to Vision on terms that were unfavorable to Vision, and leaving aside the question of whether Stevens had the authority unilaterally to terminate Jarmusch's compensation,[8] Stevens' conduct toward the minority shareholders starting in 1994 involved substantial breaches of fiduciary duty and oppression of minority shareholders and entirely justifies the relief that the trial court ordered.

In particular, we agree with the trial court that Stevens' withholding of the subchapter S distributions in order to try to force Tifft and Jarmusch to agree to his demands or face bankruptcy, and Stevens' contractual arrangement for Jarmusch to violate the provisions of the buy-sell agreement in order to prevent Tifft from exercising his stock option, both constitute breaches of fiduciary duty and oppressive conduct toward minority shareholder Tifft.

As to the withholding of the subchapter S distributions, we conclude that this case differs considerably from *Iwasaki v. Iwasaki Bros.*, 58 Or App 543, 547, 649 P2d 598 (1982), in which we held that failure to distribute earnings that were taxable to shareholders under subchapter S did not constitute oppressive conduct because legitimate business reasons existed for retaining the earnings. *See also Zidell v. Zidell, Inc.*, 277 Or 413, 560 P2d 1086 (1977). Here, Stevens, Tifft and Jarmusch had agreed that Vision would fund these distributions when they agreed to change Vision from a C corporation to a subchapter S corporation. Here, also, ample evidence demonstrated that Stevens' decision to withhold the subchapter S payments was not made because Vision had legitimate needs to withhold the funds but because Stevens was using those payments as leverage to get Jarmusch and

---

[8] Stevens argues that he terminated only Jarmusch's compensation as an "employee" rather than his compensation as an "officer" and, thus, did not violate section 25(a) of the buy-sell agreement. The record, however, leads us to conclude that Jarmusch always had been compensated as an "officer."

Tifft to agree to changes in the buy-sell agreement that would benefit him personally.

Stevens argues that he cannot be held accountable for Vision's failure to make the subchapter S payment in the first quarter of 1995 because this occurred "under Jarmusch's regime." We do not agree. As noted above, Stevens controlled Vision's line of credit and refused to authorize Jarmusch to draw on the line of credit to make the subchapter S payments. The financial condition of Vision at that time required use of the line of credit in order to make the agreed-on subchapter S payments. Stevens argues that his decision was entirely justifiable and was financially sound because Jarmusch was, in fact, doing a terrible job of managing the finances of Vision. That, however, is not dispositive here. Regardless of his personal opinion concerning Jarmusch's performance, the decision on whether Vision was to fund the subchapter S distributions was a decision that the board had authority to make and did make; it was not a decision for Stevens to make unilaterally. *Compare Delaney*, 278 Or at 322-24 (finding of financial loss to corporation is not required to support a claim of oppression where a party usurps the power of the board of directors to make decisions). The trial court correctly determined that "Mr. Stevens, in fact, used his financial control over the subchapter S distributions in a manner that was, in fact, oppressive to the minority and not for the best interest of the corporation."

Stevens' contractual arrangement with Jarmusch for Jarmusch to violate the buy-sell agreement rather than permit Tifft to purchase his shares clearly constitutes a breach of Stevens' fiduciary duty to minority shareholder Tifft. Moreover, the contractual arrangement between Stevens and Jarmusch to vote against Vision redeeming Jarmusch's stock for the $5,000 listed in the buy-sell agreement similarly was a breach of Stevens' fiduciary duty toward Vision, as it deprived Vision of an opportunity to reacquire its stock at a very good price. Similarly, Stevens' pursuit of litigation on behalf of Vision against Jarmusch without Tifft's knowledge, and his settlement of that litigation on terms that were advantageous to himself personally and disadvantageous to both Vision and Tifft, constituted a breach of

Stevens' fiduciary duty to Vision itself and oppressive conduct as to Tifft.

As to Stevens' other self-dealing conduct, and his treatment of Tifft after Stevens had succeeded in getting rid of Jarmusch, we express no opinion as to whether those acts, in and of themselves, constituted "oppressive conduct." We do, however, note that that evidence, when viewed in conjunction with the evidence of breach of fiduciary duty described above, supports the trial court's determination that Stevens' ongoing course of conduct was sufficiently serious to warrant a remedy under ORS 60.661. *See generally Baker*, 264 Or at 630 (single or even multiple breaches of fiduciary duty do not necessarily constitute oppression of minority shareholders unless they cause disproportionate loss to the minority or demonstrate that those in control are incorrigible and cannot be trusted).

The parties' various other arguments pertaining to Tifft's breach of fiduciary duty and minority shareholder oppression claims and Stevens' asserted defense of waiver do not warrant discussion. The trial court correctly determined that Stevens' breaches of fiduciary duty and oppression of minority shareholders entitled Tifft to relief under ORS 60.661.

■ In a separate assignment of error, Stevens Tool & Die argues that the trial court erred in granting relief on Tifft's derivative claim for breach of fiduciary duty by ordering it to disgorge the profits it had made on the transaction where the lower bid of a competitor had been falsified. *See* note 6 above. Stevens Tool & Die points out that, although Stevens personally owed a fiduciary duty to Vision, it did not and thus argues that the trial court, therefore, could not order the remedy that it did. Tifft responds by reciting the evidence that the bid had, indeed, been falsified and that Stevens Tool & Die had ultimately profited from that falsification. Although that is true, it also is unresponsive to the argument that Stevens Tool & Die does not owe a fiduciary duty to Vision and, therefore, could not have breached a fiduciary duty to Vision. We conclude that this assignment of error is well-taken and

that the trial court erred in granting judgment against Stevens Tool & Die on this claim.[9]

Stevens' remaining assignments of error on appeal concern the trial court's award of attorney fees to Tifft in the oppression case and its denial of attorney fees to Stevens in the M4U case. Given our conclusion above that Tifft prevailed in the M4U case on his defense of waiver, Stevens was not entitled to an award of attorney fees in that case. As to Stevens' arguments pertaining to attorney fees in the oppression case, we affirm the trial court's award without further discussion.

On Tifft's cross-appeal, he argues that the trial court erred in several respects in failing to award him damages in excess of the buy-out price for his stock. On those assignments of error, we affirm without discussion. Tifft also cross-appeals the trial court's refusal to allow him to amend his complaint after trial to seek prejudgment interest. In *Smith v. Williams*, 98 Or App 258, 263, 779 P2d 1057 (1989), we stated that "[p]rejudgment interest is proper when the exact amount owing is ascertained or easily ascertainable by simple computation or by reference to generally recognized standards and where the time from which interest must run can be ascertained." In the present case, Tifft has prevailed on claims concerning an ongoing course of conduct that, cumulatively, constituted oppression of a minority shareholder and entitled him to relief in the form of a buy-out remedy under ORS 60.661. Under such circumstances, prejudgment interest is not easily ascertainable from any one particular date. In a case such as this, the trial court, in determining the appropriate equitable remedy, may consider the ongoing nature of the oppressive conduct and the effect such conduct may have had over time on the value of the oppressed minority shareholder's stock in determining the buy-out price. We conclude that the trial court did not abuse its discretion in denying Tifft's post-trial motion to amend his complaint to seek prejudgment interest.

---

[9] We express no opinion as to whether plaintiffs could have stated a claim other than breach of fiduciary duty against Stevens Tool & Die, *e.g.,* unjust enrichment or money had and received, as plaintiffs did not plead any alternative theories of recovery and make no arguments on appeal that their pleadings stated anything other than a claim for breach of fiduciary duty.

Tifft also assigns error to the trial court's award of attorney fees to Vision for his alleged breach of the noncompete and nonsolicitation provisions of the buy-sell agreement. Because of our determination set forth above that Tifft prevailed on his defense of waiver, the trial court erred in awarding Vision attorney fees on that claim.

The parties' other arguments do not merit discussion.

On appeal, reversed as to Stevens Tool & Die on Tifft's claim for breach of fiduciary duty and reversed as to Stevens on Tifft's claim for breach of the noncompete provisions of the buy-sell agreement; otherwise affirmed. On cross-appeal, reversed as to Vision's claim for breach of the noncompete and nonsolicitation provisions of the buy-sell agreement and the accompanying award of attorney fees to Vision; otherwise affirmed. Remanded for entry of judgment accordingly.