Argued and submitted January 16, affirmed March 21, 1984

WHITE STAG MANUFACTURING CO.,
*Respondent,*

*v.*

WIND SURFING, INC.,
*Defendant,*

*and*

GROSS,
*Appellant.*

(A8003-01477; CA A27161)
679 P2d 312

Elizabeth Yeats, Portland, argued the cause for appellant. With her on the briefs were Michael J. Caro, and Kobin & Meyer, P.C., Portland.

John S. Cavanagh, Portland, argued the cause for respondent. With him on the brief were Arthur L. Tarlow, and Bolliger, Hampton & Tarlow, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, J., Judges.

WARREN, J.

## WARREN, J.

Plaintiff White Stag Manufacturing Co. seeks to recover in this action on an alleged oral guaranty by defendant Kenneth Gross to pay certain debts of Wind Surfing, Inc. The court entered judgment awarding damages to White Stag against Gross in the amount of $49,637.87 with prejudgment interest from December 19, 1979. We affirm.

Gross, a New York resident engaged in the plastics business,[1] was the primary unsecured creditor of Wind Surfing, a manufacturer of ski apparel. On June 15, 1979, Gross telephoned Beverly Bray, White Stag's Eastern Division credit manager, in Portland to inquire whether White Stag would extend credit to Wind Surfing for the upcoming ski season. Bray informed Gross that Wind Surfing's past due balance at that point was $24,000 and that White Stag would not talk about new orders until the past due balance was paid. Bray testified that Gross told her in that phone conversation that he would be willing to give White Stag a letter of credit or his personal guaranty to secure payment. Bray asked Gross for his financial statement, which arrived in Portland on July 27, 1979.

Several phone contacts followed between Bray, Rew (her supervisor), and Gross. On August 10, 1979, Bray advised Gross by phone that she had made arrangements with Wind Surfing for the past due balance and that she would allow Wind Surfing an open line of credit for $25,000 if Gross would extend his guaranty or give a bank letter of credit for an additional $50,000 of orders. Bray confirmed that arrangement in a letter to Gross dated August 15, 1979, in which she enclosed personal guaranty forms.[2] Shortly thereafter, the

---

[1] Gross' partner in the plastics business was George Weir. We infer from the letter quoted in note 2, *infra,* that some representation was made to White Stag that Weir would join Gross in personally guaranteeing Wind Surfing's account. Weir was not named as a party in this action and is not referred to further in the briefs.

[2] The text of the letter reads:

"To date we have not received the Personal Financial Statement from George Weir. I am assuming it will be substantial and am therefore enclosing 2 Personal Guaranty forms. Please have George sign one and return with his statement. The other one is for yourself to sign and have notarized and return to my attention.

"Ken, I have agreed to accept postdated checks from Fred to pay off the obligation to White Stag and will allow an open line of credit for $25,000. However, for the other $50,000 we will require a Bank Letter of Credit. For this

arrangements with Wind Surfing for the past due balance fell through, and Gross personally wired $14,000 to White Stag to cover the past due account.[3] On August 22, 1979, Gross called Bray to check the progress in releasing the fall shipment. Bray testified, and the trial court found, that Gross promised Bray in that conversation that he had executed the guaranty form and that it was in the mail.[4] Gross testified that White Stag had agreed to accept the $14,000 on the past due account in place of a guaranty of the entire account and a letter of credit for $50,000. The trial court found that his testimony lacked candor and credibility.

White Stag released Wind Surfing's order, commencing with $2,574.88 worth of goods shipped on August 23, 1979, and made successive shipments in the months of September, October, November and December, 1979, for a total outstanding balance of $49,637.87. Gross' guaranty never arrived, and Wind Surfing never paid its accounts.

White Stag filed this action against Wind Surfing as principal debtor and Gross as personal guarantor to recover money due on goods shipped. Wind Surfing was not served and made no appearance. Gross claimed that the Oregon courts lack personal jurisdiction and that White Stag's action alleging an oral guaranty is barred by ORS 41.580, which provides, in pertinent part:

"In the following cases the agreement is void unless it, or some note or memorandum thereof, expressing the consideration is in writing subscribed by the party to be charged * * *:

"* * * * *

"(2) An agreement to answer for the debt, default or miscarriage of another."

---

consideration I have extended the due date to 2-20-80. Should Fred be able to handle the payoff by January 10, 1980 from the store cashflow, then the Letter of Credit will not be used.

"Ken, it is very important that we recieve the above documents as soon as possible, otherwise some of the merchandise may not be available. Hope to receive a reply by August 30, 1979."

[3] Bray's supervisor, Rew, overruled her arrangement with Wind Surfing to accept post-dated checks.

[4] The trial court's finding of fact No. 15 reads:

"Plaintiff has established by a preponderance of the evidence that Gross led Bray to believe that he had executed the guaranty and that the guaranty was in the mail."

The trial court concluded that Gross was within the jurisdiction of the Oregon courts and that, under the main purpose exception to ORS 41.580(2), White Stag is entitled to full recovery.[5] Gross appeals, claiming error as to both issues.

The traditional analysis applied to determine if personal jurisdiction is appropriate is in two parts. We inquire whether the Oregon "long-arm" statute permits an Oregon court to acquire personal jurisdiction over Gross and, if so, whether the assertion of jurisdiction over Gross offends due process rights guaranteed by the Fourteenth Amendment. *State ex rel Academy Press v. Beckett,* 282 Or 701, 708, 581 P2d 496 (1978).

■ White Stag asserts jurisdiction over Gross under ORCP 4E[6] and 4L. The commentary to ORCP 4E tells us that this section is designed to provide maximum flexibility for minimum contacts arising in situations of contractual activity and provisions of goods and services. Read with ORCP 4L,[7]

---

[5] In the alternative, the trial court held that Gross is estopped from raising the Statute of Frauds as a defense to his obligation for shipments made before November 1, 1979.

[6] ORCP 4E(3) and (4) provide:

"A court of this state having jurisdiction of the subject matter has jurisdiction over a party served in an action pursuant to Rule 7 under any of the following circumstances:

"* * * * *

"In any action or proceeding which:

"E.(3) Arises out of a promise, made anywhere to the plaintiff or to some third party for the plaintiff's benefit, by the defendant to deliver or receive within this state or to send from this state goods, documents of title, or other things of value or to guarantee payment for such goods, documents, or things; or

"E.(4) Relates to goods, documents of title, or other things of value sent from this state by the plaintiff to the defendant on the defendant's order or direction or sent to a third person when payment for such goods, documents, or things was guaranteed by defendant * * *."

[7] ORCP 4L provides:

"A court of this state having jurisdiction of the subject matter has jurisdiction over a party served in an action pursuant to Rule 7 under any of the following circumstances:

"* * * * *

"L. Notwithstanding a failure to satisfy the requirement of sections B. through K. of this rule, in any action where prosecution of the action against a defendant in this state is not inconsistent with the Constitution of this state or the Constitution of the United States."

which specifically authorizes any exercise of jurisdiction by Oregon not inconsistent with the constitution of this state or the Constitution of the United States, it is apparent that ORCP 4E was intended to provide jurisdiction in a case of contractual activity as far as permitted by the limits of the Constitution, merging the issues of long arm jurisdiction and due process protection. We inquire then whether the transaction between these parties presents sufficient minimum contacts such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Internat. Shoe Co. v. Washington,* 326 US 310, 66 S Ct 154, 90 L Ed 95 (1945); *World-Wide Volkswagen Corp. v. Woodson,* 444 US 286, 100 S Ct 559, 62 L Ed 2d 490 (1980); *State ex rel White Lbr. v. Sulmonetti,* 252 Or 121, 448 P2d 571 (1968).

In *White Lbr.,* the Supreme Court outlined the requirements relevant here to the constitutional exercise of jurisdiction:

"* * * First, the defendant must purposefully avail himself of the privilege of acting in the forum state or of causing important consequences in that state. Second, the cause of action must arise from the consequences in the forum state of the defendant's activities. Finally, the activities of the defendant or the consequences of those activities must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *Southern Machine Co. v. Mohasco,* 401 F2d 374 (6th Cir 1968)." 252 Or at 127.

In *Resorts Marketing v. Zuckerman,* 52 Or App 589, 628 P2d 770 (1981), we applied those requirements where a Massachusetts resident's telephone request for an Oregon company's services in renting a villa led the company to guarantee payment to the villa's owner. The Massachusetts resident subsequently stopped payment on his check, and the Oregon company had to make payment to the villa owner. We held that the phone contacts between the Massachusetts resident and the Oregon company caused important consequences in Oregon and provided a sufficiently substantial connection with Oregon that exercise of jurisdiction over the Massachusetts resident was reasonable.

■ ■ Gross argues that he did not cause any economic consequences in Oregon, because shipments of the goods, although authorized by Bray in Oregon, were actually made

from Tennessee. We are not persuaded. Gross called White Stag's credit office in Oregon to convince White Stag to extend credit to Wind Surfing. To further that end, Gross had numerous phone contacts with White Stag's credit office in Portland over a period of several months and subsequently guaranteed payment of Wind Surfing's debt to White Stag's Portland office. There was never any doubt that the extension of credit Gross sought would be completed in Oregon. While a nonresident causing the actual shipment of goods from Oregon may give rise to personal jurisdiction in certain circumstances, *see, e.g., State ex rel White Lbr. v. Sulmonetti, supra,* jurisdiction is also proper when a national corporation makes all necessary negotiations, authorizes the extension of credit in Oregon and pursuant to these arrangements releases goods stored in another state. Under these circumstances, the extension of credit has no less economic impact than the shipment of goods.

 Gross further claims that *State ex rel Sweere v. Crookham,* 289 Or 3, 609 P2d 361 (1980), is controlling and supports his contention that his alleged oral guaranty caused no economic consequences. Again, we are not persuaded. As we explained in *Resorts Marketing v. Zuckerman, supra,* 52 Or App at 594, the court in *Sweere* found no jurisdiction, because the execution of the guaranty occurred several months after the goods had been delivered, and because there was no showing that the Oregon corporation relied on the guaranty in continuing to do business with the company for whom the guarantor worked. Reliance on a guaranty is a critical factor and was not disputed in the present case. It is proper when a guaranty plays an integral part in causing or promoting important economic consequences in Oregon to assert jurisdiction over a nonresident guarantor. *See State ex rel Ware v. Hieber,* 267 Or 124, 133, 515 P2d 721 (1973); *State ex rel Sweere v. Crookham, supra,* 289 Or at 10.

We conclude that it was reasonable for Gross to understand that the extension of credit he sought from White Stag's Portland office would cause important economic consequences in Oregon and that, if a problem arose over the extension of that credit, he would be subject to the jurisdiction of Oregon courts. Exercise of personal jurisdiction under these circumstances falls within ORCP 4E and does not offend due process.

In his second assignment of error, Gross claims that the trial court erred in holding that the Statute of Frauds did not bar White Stag's recovery. The "main purpose" or "original promise" doctrine excuses the requirement that a promise to answer for the debt of another be in writing when the consideration for the promise is in fact or apparently desired by the promisor mainly for his or her own advantage, rather than to benefit the third person. Restatement (Second) Contracts, § 116 (1979); *Meader v. Orbit Inn Corporation,* 276 Or 921, 923, 556 P2d 1365 (1976). The doctrine is applied when the pecuniary interests of a promisor in a commercial context replace the gratuitous elements often present in suretyship. It eliminates the need for the evidentiary safeguards provided by the writing requirement of the Statute of Frauds. The decisive factor is not the presence or nature of consideration, but whether the promise is such that the promisor became, within the intention of the parties, a primarily liable debtor. In *Umpqua Valley Bank v. Wilson,* 120 Or 396, 407, 252 P 563 (1927), the Supreme Court explained:

> "Whenever the main purpose and object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own, involving a benefit to himself, his promise is not within the statute, although it may be in form a promise to pay the debt of another and its performance incidently may have that effect. And when there is a benefit to the promisor or to a third party at his instance, it is a good consideration upon which to maintain an action * * *." (Citations omitted.)

The trial court found that Gross' main purpose, as a substantial general creditor, in guaranteeing the account of Wind Surfing was to see the business of his debtor continue and prosper so that he could be repaid the substantial funds he had advanced to Wind Surfing. In an action at law,[8] we are bound by the trial court's findings if they are supported by substantial evidence. *White v. Bello,* 276 Or 931, 933, 556 P2d 1362 (1976); *Hassan v. Guyer,* 271 Or 349, 352, 532 P2d 227 (1975); *Samoth Financial Corp. v. Mr. Moto's Coffee,* 48 Or App 247, 250, 616 P2d 1190 (1980), *rev den* 290 Or 491 (1981).

There is evidence in this case that Gross had a substantial, personal, immediate and pecuniary interest in

---

[8] Plaintiff's claim for relief on the guaranty is a claim for damages for breach of contract, which is an action at law.

Wind Surfing's continued existence. He had lent it $47,000 by unsecured direct loans and executed letters of credit.[9] As a general creditor with no secured interest, his only realistic hope of recovering that money was the continued existence and prosperity of Wind Surfing. In order to persuade White Stag to extend credit, Gross actively pursued the White Stag credit department and, at one point, personally wired $14,000 to White Stag in satisfaction of Wind Surfing's past due account. Gross testified that his actions to further the success of Wind Surfing were in the hope of getting back all of the money he had loaned it and eventually acquiring a one-third interest in Wind Surfing. Under these circumstances, we accept the trial court's finding that Gross was motivated by personal benefit to guarantee the account and conclude that his actions and promise to pay make it proper to hold him primarily liable. The trial court was correct in holding that the main purpose exception to the Statute of Frauds is applicable and that White Stag is entitled to full recovery.

Affirmed.

---

[9] Gross testified that, with the guaranties he had made to Wind Surfing, his "exposure was going to be closer to seventy or eighty thousand dollars."