Argued and submitted July 19, reversed and remanded October 11, 2006

NIKE USA, INC.,
*Appellant,*

*v.*

PRO SPORTS WEAR, INC.,
and Javed Iqbal,
aka Javed Iqbal Butt,
*Respondents.*

0405-04726; A128283

145 P3d 321

M. Elizabeth Duncan argued the cause for appellant. With her on the briefs was Greene & Markley, P.C.

Terrence J. Slominski argued the cause and filed the brief for respondents.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Linder, Judge.*

BREWER, C. J.

---

\* Linder, J., *vice* Ceniceros, S. J.

**BREWER, C. J.**

Plaintiff, an Oregon corporation, appeals a judgment dismissing this action to collect a commercial debt from defendants, an Ohio corporation and its individual guarantor, an Ohio resident, after the trial court granted defendants' motion to dismiss the action for lack of personal jurisdiction. ORCP 21 A(2). The trial court dismissed the action on the grounds that plaintiff had not established either that defendants consented to jurisdiction in Oregon, ORCP 4 A(5), or that an exercise of long-arm jurisdiction was constitutionally permissible under ORCP 4 L. Because we conclude that jurisdiction exists under ORCP 4 L, we reverse and remand.

■ Plaintiff had the burden of alleging and proving facts sufficient to establish personal jurisdiction. *Dreher v. Smithson*, 162 Or App 645, 648, 986 P2d 721 (1999), *rev den*, 329 Or 589 (2000). The record on defendants' motion to dismiss for lack of personal jurisdiction consists of the pleadings and the evidence, including affidavits, that the parties presented before the trial court. ORCP 21 A; *Industrial Leasing Corp. v. Miami Ice Machine Co.*, 126 Or App 80, 83-84, 867 P2d 548 (1994).

Plaintiff is an Oregon corporation that does business throughout the United States. Defendant Pro Sports Wear, Inc. (Pro Sports) is an Ohio corporation that operates two retail stores selling sportswear products in Ohio. Defendant Iqbal, who resides in Ohio, is the president and sole shareholder of Pro Sports. In the fall of 2000, Iqbal met plaintiff's regional sales representative in Cleveland, Ohio, in an effort to obtain plaintiff's products to sell in his stores. At the meeting, plaintiff's representative gave Iqbal an application and agreement for credit (credit agreement) and personal guaranty forms to complete and return to plaintiff for processing. Plaintiff's address shown on the credit agreement was in Beaverton, Oregon, and its telephone and fax numbers were listed with area code 503. Iqbal presented an affidavit stating, among other assertions, that plaintiff's representative, whose office was in Pennsylvania, asked Iqbal to complete the forms and fax them to him for processing and that Iqbal

had "never contacted [plaintiff's] offices in the State of Oregon about these forms."

However, the record includes a fax transmittal sheet showing that plaintiff's regional representative faxed the credit agreement to Iqbal with instructions to "complete and fax back to Erin Wheeldon at 503-532-6899." Consistently with those instructions, the record also includes fax transmittal sheets showing that, on November 13, 2000, Iqbal sent an "urgent" fax to plaintiff to the attention of "Erin" in the credit department at the foregoing Oregon fax number with a note stating, "If you have any question call me please." In the same fax transmittal, Iqbal sent Wheeldon a bank authorization form authorizing defendants' bank to release financial information to plaintiff "to enable them to set the highest possible credit line to accommodate my purchases." Finally, Iqbal faxed his signed personal guaranty to Wheeldon in the same transmittal. Plaintiff relied on those financial documents in making its decision to extend credit to defendants.

In his affidavit, Iqbal stated that plaintiff's regional representative "called me and told me that my credit application was approved and I subsequently placed all my orders through [plaintiff's] regional sales agents who were located either in Ohio or Pittsburgh, Pennsylvania (about 120 miles from Cleveland, Ohio)." A handwritten notation on a fax copy of the credit agreement stated that it was "Ok'd" by plaintiff's regional sales representative on "11/20/00." On November 20, 2000, Wheeldon sent a letter to Pro Sports stating that the credit department had received his credit application and approved a $15,000 line of credit. Wheeldon signed the letter as plaintiff's credit manager, and the letterhead contained the same Oregon address, telephone, and fax numbers as previously shown.

In his affidavit, Iqbal stated that, "[u]ntil [plaintiff] filed this lawsuit against me, I did not even know where [plaintiff's] headquarters were located." Iqbal also stated that "I never had any direct or indirect contacts with [plaintiff's] offices in Oregon." However, in addition to the transmittals relating to the credit agreement in November 2000, the record also shows that Iqbal sent correspondence to or received correspondence from plaintiff's credit department in Oregon

on at least ten additional occasions from August 2002 through April 2004.

The credit agreement required defendants to provide financial statements to plaintiff. On October 16, 2003, defendants complied with that requirement by faxing financial statements to plaintiff in Oregon. Plaintiff relied on those statements in deciding to extend further credit to defendants. Pursuant to the credit agreement, Pro Sports purchased merchandise from plaintiff through November 28, 2003. As shown by plaintiff's statement of account, the unpaid balance for the merchandise was $114,839.50.

The record includes invoice forms for each of Pro Sports' purchases from plaintiff. The invoices were sent from a California address, and the merchandise that defendants purchased from plaintiff apparently was shipped from California. The reverse side of each of the invoices included a clause that provided that "Customer consents to the nonexclusive jurisdiction of and venue in any state or federal court located in the state of Oregon. This means that [plaintiff] can file suit against Customer in any court located within the state of Oregon." Although the invoices were regularly sent to Pro Sports, defendants did not sign them. In his affidavit, Iqbal stated that he had "never signed any agreements on the behalf of [Pro Sports] or myself consenting to the jurisdiction of state of Oregon."

Defendants' last prelitigation contact with plaintiff in Oregon occurred on March 29, 2004, when defendants were attempting to work out a payment plan with plaintiff for the unpaid merchandise. On that date, defendants sent a fax to one of plaintiff's Oregon representatives stating, "please fax me the agreement i will 100% sign today and also send u check too." Plaintiff's representative sent a promissory note and payment plan to defendants, but they did not sign and return the instrument.

Plaintiff filed this action against defendants in Multnomah County Circuit Court. Plaintiff's complaint included claims for breach of contract, account, account stated, goods sold and delivered, and guaranty. As noted, defendants filed a motion to dismiss the action for lack of personal jurisdiction. After briefing and argument, the trial

court issued a letter ruling granting the motion. The court stated, "Defendants did not consent to jurisdiction; nor did defendants have sufficient contact with Oregon to otherwise provide a basis for jurisdiction."

On appeal, plaintiff renews its arguments that the trial court had jurisdiction over defendants on two bases: (1) the forum consent provision contained on the reverse side of plaintiff's invoices to Pro Sports and (2) long-arm jurisdiction under ORCP 4 L. Defendants respond that (1) the credit agreement did not include a forum selection clause, and the agreement was not amended by the clause contained on the reverse side of the invoices and (2) there was no evidence that defendants had minimum sufficient contacts with the State of Oregon to confer jurisdiction on the Oregon courts.

In reviewing the grant of a motion to dismiss an action for lack of personal jurisdiction, we construe the pleadings and affidavits liberally in favor of jurisdiction. *State ex rel Michelin v. Wells,* 294 Or 296, 301, 657 P2d 207 (1982). However, in determining whether a defendant is subject to the jurisdiction of an Oregon court, courts look to the pleadings and the affidavits of both parties. *Management Recruiters v. Harold Moore & Assoc.,* 118 Or App 614, 616, 848 P2d 644, *rev den,* 317 Or 162 (1993). We review the trial court's factual findings to determine whether they are supported by " 'any competent evidence,' " *Sutherland v. Brennan,* 131 Or App 25, 28, 883 P2d 1318 (1994), *aff'd,* 321 Or 520, 901 P2d 240 (1995) (quoting *Industrial Leasing Corp.,* 126 Or App at 85). Where, as here, the trial court made limited express findings, we assume that the court found additional relevant facts consistent with its judgment. *Management Recruiters,* 118 Or App at 616. Once the jurisdictional facts are established, we review the determination of personal jurisdiction for errors of law. *Boehm & Co. v. Environmental Concepts, Inc.,* 125 Or App 249, 252, 865 P2d 413 (1993).

We begin with plaintiff's argument that defendants consented to the jurisdiction of Oregon's courts by repeatedly purchasing goods for which invoices containing an Oregon forum selection clause were sent. We reject that argument for at least two reasons. First, with respect to Iqbal, the forum

selection clause in the invoices referred only to the "Customer"; there was no evidence that the parties agreed that Iqbal was plaintiff's customer. Rather, Iqbal was Pro Sports' guarantor. Thus, there was no evidence that Iqbal expressly consented to the jurisdiction of Oregon's courts. Second, as defendants observe, the credit agreement did not contain a forum selection clause. Plaintiff's consent theory thus reduces to the premise that the invoices automatically became part of the parties' bargain with respect to each sale of merchandise. That is, plaintiff assumes that the forum selection clause became part of the parties' bargain because defendants continued to order merchandise after receiving dozens of invoices containing such a clause.

Forum selection clauses contained in commercial contracts are *prima facie* enforceable; they will be disregarded only where the evidence shows that enforcement would be unfair and unreasonable. *Reeves v. Chem Industrial Co.*, 262 Or 95, 98-101, 495 P2d 729 (1972). Whether a particular forum selection clause is enforceable is a fact-based inquiry. *See Colonial Leasing Co. v. McIlroy*, 94 Or App 273, 277, 765 P2d 219 (1988). The resolution of personal jurisdiction disputes by pretrial motion requires courts to accept as true *uncontroverted* evidence showing that a forum selection clause was part of the parties' bargain. *Id.* at 277-78. Here, however, the evidence was in conflict as to whether the parties consciously bargained for the invoice terms. Although, as plaintiff suggests, it is possible to infer that the provision became part of the parties' ongoing bargain based on its sheer repetition in multiple unsigned invoices, defendants deny that they ever agreed to that provision. Instead, they signed an overarching credit agreement that did not contain such a provision, and its inclusion in invoices sent after oral orders for goods were made may, but need not, have resulted in an amendment to the parties' bargain. Whether a provision contained in an unsigned invoice sent by a seller of goods to the buyer constituted an effective modification of the parties' previous agreement is a question of fact that depends on the parties' intent. *Willamette-Western Corp. v. Lowry*, 279 Or 525, 529-30, 568 P2d 1339 (1977). In this case, the trial court found that defendants did not consent to the jurisdiction of

Oregon's courts. Because there is evidence in the record supporting that finding of fact, we are bound by it for purposes of the determination of personal jurisdiction. *Sutherland*, 131 Or App at 28-29; *Industrial Leasing Corp.*, 126 Or App at 85.

■    We turn to the issue whether defendants are subject to personal jurisdiction under ORCP 4 L.[1] The United States Supreme Court has long recognized that due process limits the power of a state court to exercise personal jurisdiction over an out-of-state defendant. *See Pennoyer v. Neff*, 95 US 714, 733-34, 24 L Ed 565 (1877). The basis for that conclusion has shifted from territorial limitations on process to limitations based on fairness and convenience to the parties involved. *International Shoe Co. v. Washington*, 326 US 310, 316, 66 S Ct 154, 90 L Ed 95 (1945) (explaining the shift from the rationale in *Pennoyer*). As the Court explained in *International Shoe*,

> "now that the *capias ad respondendum* has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

326 US at 316. The "criteria by which [a court] mark[s] the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical and quantitative." *Id.* at 319. Rather, "[w]hether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to ensure." *Id.*

---

[1] ORCP 4 provides, in part:

"A court of this state having jurisdiction of the subject matter has jurisdiction over a party served in an action pursuant to Rule 7 under any of the following circumstances:

"\* \* \* \* \*

"**L  Other actions.** Notwithstanding a failure to satisfy the requirement of sections B through K of this rule, in any action where prosecution of the action against a defendant in this state is not inconsistent with the Constitution of this state or the Constitution of the United States."

Since *International Shoe Co.*, the courts have sought to define more precisely the principle that the Court articulated in that case. As refined in later cases, the inquiry divides into two parts:

> "First, the defendant must have 'minimum contacts' with the forum state. 'Minimum contacts' will be found where the defendant has 'purposefully directed' its activities at residents of the forum state *and* where the litigation 'arises out of or relates to' those activities. *Burger King Corp. v. Rudzewicz*, [471 US 462, 472, 105 S Ct 2174, 85 L Ed 2d 528 (1985)]. Second, even if minimum contacts exist, the exercise of jurisdiction must be reasonable; in the light of various factors deemed relevant by the Court, the exercise of jurisdiction must comport with 'fair play and substantial justice.' *Id.* at 476-77."

*State ex rel Circus Circus Reno, Inc. v. Pope*, 317 Or 151, 159-60, 854 P2d 461 (1993) (emphasis in original).

The first part of the inquiry—whether a defendant purposefully has directed or availed itself of the privileges of conducting activities within the forum state—"ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp.*, 471 US at 475. The Court accordingly explained in *Burger King Corp.*:

> "[A]n individual's contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts in the other party's home forum * * *. The Court long ago rejected the notion that personal jurisdiction might turn on mechanical tests, or on conceptualistic * * * theories of the place of contracting or of performance. Instead, we have emphasized the need for a highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. It is these factors— prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."

471 US at 478-79 (internal quotation marks and citations omitted; emphasis in original).

Oregon courts have on several occasions applied those criteria to commercial transactions where a decision to extend credit was made in Oregon. In *State ex rel Sweere v. Crookham*, 289 Or 3, 609 P2d 361 (1980), the Oregon Supreme Court held that the execution of a guaranty to an Oregon corporation, by itself, is insufficient to establish personal jurisdiction. To satisfy constitutional standards, the court held, there must be evidence that the guaranty played an "integral part in causing or promoting significant economic consequences in Oregon." *Id.* at 9-10. As an example of the sort of economic consequences that it considered to be constitutionally significant, the court referred to *State ex rel Ware v. Hieber*, 267 Or 124, 133, 515 P2d 721 (1973), where the execution of a personal guaranty caused an Oregon company to continue a franchise agreement that otherwise would have been terminated. The most important fact in *Ware*, the court said, was that the plaintiff in that case had relied on the guaranty in conducting its business in Oregon. *State ex rel Sweere*, 289 Or at 9. When personal jurisdiction has been predicated on the execution of a guaranty, we have found the criteria satisfied in that important economic consequences flowed from that act, because credit was extended in Oregon by a corporation in reliance on the guaranty. *White Stag Mfg. Co. v. Wind Surfing, Inc.*, 67 Or App 459, 465, 679 P2d 312 (1984).

Defendants, however, argue that those criteria are not met here; they make three specific arguments that require discussion. First, defendants assert that they had no idea that plaintiff was an Oregon corporation. Therefore, according to defendants, they did not purposefully avail themselves of the privilege of causing economic consequences in Oregon. We reject that argument. Defendants were instructed to send the signed credit agreement and personal guaranty to Wheeldon, whose office was in Oregon, and they did so. The documentary evidence that Iqbal faxed the completed documents to plaintiff's credit department in Beaverton was not refuted. In their submissions, defendants essentially ignored that compelling evidence. Moreover,

assuming that defendants did not actually know that plaintiff was an Oregon corporation, what we said in *Nike, Inc. v. Spencer*, 75 Or App 362, 374, 707 P2d 589, *rev den*, 300 Or 451 (1985) is equally apropos here:

"[W]e believe that in a sophisticated commercial transaction such as this it was [defendants'] obligation to determine with whom they were contracting and that knowledge must be imputed to them. There is no indication that [plaintiff] concealed information from those defendants regarding its corporate location nor any indication that defendants thought they were dealing with a local company. We decline to hold that defendants under these circumstances may rely on their own failure to investigate as a shield against jurisdiction in Oregon."

Second, defendants assert that the "credit was approved in Ohio by [plaintiff's regional sales representative]" and that plaintiff's submissions do not "demonstrate any personal knowledge" as to whether Wheeldon's letter approving defendants' credit application was sent to defendants. Those arguments are not well taken. Although a handwritten notation on a faxed copy of the credit agreement indicates "Ok'd" by plaintiff's sales representative, there is no evidence that he had ultimate authority to extend credit to defendants. Further, defendants' challenge to Wheeldon's letter rings hollow. First, defendants do not refer us to any portion of the record showing that they challenged the admissibility of the letter before the trial court. In any event, the affidavit to which the letter was attached as an exhibit, affirmatively stated that the letter was sent to defendants, that it was a business record of which the affiant was a custodian, and that the assertions made in the affidavit were based on the affiant's personal knowledge. In short, Wheeldon's letter was properly made part of the evidentiary record, and it constituted conclusive evidence of what it was offered to show, namely, that plaintiff's credit department in Oregon made the ultimate decision to extend credit to defendants and that that fact was communicated to defendants.

Finally, defendants observe that the products that they purchased from plaintiff were shipped and invoiced from California. As defendants see things, "[t]he acts by

defendant were done in Ohio for the purpose that a corporation doing business in California and Ohio sell him product." Again, that argument misses the mark. To be sure, plaintiff did not ship merchandise to defendants from Oregon. Rather, plaintiff shipped merchandise and billed Pro Sports from California. But, as the Court explained in *Burger King Corp.*, personal jurisdiction does not necessarily turn on "conceptualistic * * * theories of the place of contracting or of performance." 471 US at 478 (internal quotation marks and citation omitted). Just as a nonresident's conduct causing the actual shipment of goods from Oregon may give rise to personal jurisdiction in certain circumstances, "jurisdiction is also proper when a national corporation makes all necessary negotiations, authorizes the extension of credit in Oregon and pursuant to these arrangements releases goods stored in another state. Under these circumstances, the extension of credit has no less economic impact than the shipment of goods." *White Stag Mfg. Co.*, 67 Or App at 465.

Defendants remonstrate that this case is distinguishable from *White Stag Mfg. Co.* because "all necessary negotiations" were not made in Oregon; rather, the orders were negotiated between Pro Sports and plaintiff's regional representatives in Ohio or Pennsylvania, and discussions about credit arrangements also occurred in Ohio. However, it was not necessary that *all* orders or credit discussions have been initiated in Oregon for defendants to have purposefully availed themselves of the privilege of causing important economic consequences in Oregon. Here, the ultimate credit decisions were made in Oregon after defendants provided pertinent legal and financial documents to plaintiff's credit department in Oregon, and defendants either knew or should have known those facts.

In sum, we conclude that Pro Sports' execution of the credit agréement and Iqbal's execution of his personal guaranty played "integral parts" in causing important economic consequences in Oregon. Defendants wanted to purchase plaintiffs' merchandise on credit. Although they initially had contact with a regional sales manager from Pennsylvania, they received final credit approval from plaintiff's credit department in Oregon after sending the signed credit agreement and personal guaranty to this state. They also dealt

with representatives from plaintiff's Oregon credit department over a period of several years, and they sent Pro Sports' financial statements to plaintiff's credit department in Oregon in order to comply with their obligations under the credit agreement. Accordingly, we conclude that defendants purposefully availed themselves of the privilege of causing important economic consequences in the State of Oregon.[2]

Plaintiff's claims arise out of defendants' contacts with Oregon, *see State ex rel Circus Circus Reno, Inc.*, 317 Or at 160-61, and the only remaining question is whether exercising jurisdiction would be consistent with notions of "fair play and substantial justice."

On that point, we note that the Court explained in *Burger King Corp.* that "[a] State generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." 471 US at 473 (internal quotation marks and citation omitted). It also explained that, where individuals purposefully derive benefits from interstate activities, as defendants did here, "it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities[.]" *Id.* at 474. Finally, the Court reasoned that, given the changes in "modern transportation and communications," "it usually will not be unfair to subject [an

---

[2] Unlike our resolution of the issue whether defendants consented to the jurisdiction of Oregon courts to resolve this dispute, our resolution of the issue whether defendants purposely availed themselves of the privilege of causing important economic consequences in Oregon so as to justify the exercise of jurisdiction under ORCP 4 L does not require deference to any express or implied findings of fact that the trial court made. We note that the court did not purport to make any particular findings with respect to the latter issue. Instead, the court concluded without elaboration that defendants did not have "sufficient contact" for jurisdiction to lie. We do not agree with that legal conclusion. As noted, defendants did not effectively controvert the documentary evidence in the record showing how plaintiff's decision to extend credit to them was made. Instead, defendants' evidence consisted of carefully couched assertions concerning their lack of contact with plaintiff's Oregon offices that permitted either of only two rational inferences: (1) that the assertions were deliberately false or evasive or (2) that, despite the information available to them, defendants failed to appreciate that they were dealing with an Oregon corporation that made its ultimate credit extension decisions in Oregon. Neither inference is helpful to defendants, the first for obvious reasons, and the second, because defendants' failure to appreciate the information available to them does not undermine the conclusion that defendants purposefully availed themselves of the privilege of causing important economic consequences in Oregon.

out-of-state defendant] to the burdens of litigating in another forum for disputes relating to such activity." *Id.* All those considerations support exercising jurisdiction over defendants. In addition, since *State ex rel Ware*, we have held that "[r]eliance on a guaranty is a critical factor" in determining the reasonableness of asserting personal jurisdiction over a nonresident guarantor. *White Stag Mfg. Co.*, 67 Or App at 465; *see also Nike, Inc.*, 75 Or App at 373; *Resorts Marketing v. Zuckerman*, 52 Or App 589, 594, 628 P2d 770 (1981).

Under the circumstances of this case, defendants reasonably should have understood that, if a problem arose over credit extended to Pro Sports for goods purchased from plaintiff, they would be subject to personal jurisdiction in Oregon. Because the trial court had personal jurisdiction over defendants under ORCP 4 L, we reverse its judgment and remand for further proceedings.

Reversed and remanded.