Argued and submitted October 24, 2012, vacated, in part, and remanded for proceedings consistent with this opinion August 13, 2014

Steve MUNSON
and Cal Mitchell,
*Plaintiffs,*
*and*

Bill FRASER,
Soo Min Fay, Doug Frosch, George Marshall,
Jim Rubino, Tim Shea, and John Sullivan,
*Plaintiffs-Appellants,*

*v.*

VALLEY ENERGY INVESTMENT FUND, U. S., LP,
a Delaware limited partnership;
Vulcan Investment Holdings, LLC,
a Delaware limited liability company;
Rod Wimer; Scott Mackin; Robert Warburton;
Todd Bright; David Owens; Robert Jones;
Vulcan Power Company,
a Colorado corporation;
Denham Capital Management, LP,
a limited partnership;
Merrill Lynch Commodity Partners, LP,
a limited partnership;
Denham Commodity Partners Fund V, LP,
a limited partnership;
and ML Energy Partners, LLC,
a limited liability company,
*Defendants-Respondents,*
*and*

Richard RODGERS,
*Defendant.*

Lane County Circuit Court
160826841; A144590

333 P3d 1102

George W. Kelly argued the cause and filed the briefs for appellants.

Philip S. Van Der Weele argued the cause for respondents Valley Energy Investment Fund, U.S., LP, David Owens, Robert Jones, Merrill Lynch Commodity Partners, LP, and ML Energy Partners, LLC. With him on the brief were Richard G. Price and K&L Gates LLP.

William F. Gary argued the cause for respondents Vulcan Investment Holdings, LLC, Scott Mackin, Robert Warburton, Todd Bright, Vulcan Power Company, Denham Capital Management, LP, and Denham Commodity Partners Fund V, LP. With him on the brief were Sharon A. Rudnick, Susan D. Marmaduke, and Harrang Long Gary Rudnick P.C.; and Barry Wm. Levine, Howard N. Feldman, and Dickstein Shapiro LLP, Washington, D.C.

Mark A. Friel, Robert A. Shlachter, and Stoll Stoll Berne Lokting & Shlachter PC filed the brief for respondent Rod Wimer.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

This appeal arises from an action in which plaintiffs—common shareholders of Vulcan Power Company (Vulcan), a Colorado corporation in the business of developing geothermal power projects with its principal place of business located in Oregon[1]—brought claims against Vulcan along with several of its directors, preferred shareholders, and creditors.[2] Plaintiffs appeal the trial court's limited judgment, entered after the court dismissed the majority of plaintiffs' various claims for lack of personal jurisdiction, lack of subject matter jurisdiction, or failure to state a claim, and granted a motion to compel arbitration of several claims. On appeal, plaintiffs raise six assignments of error. For the reasons set forth below, we vacate, in part, and remand the judgment for further proceedings consistent with this opinion.

## I. BACKGROUND

We state the background facts of this case as alleged in plaintiffs' operative complaint. Plaintiffs brought this action as a result of a series of multimillion-dollar-investment transactions between Vulcan and two groups of institutional investors,[3] along with subsequent changes

---

[1] During the pendency of this case, Vulcan relocated its headquarters to Nevada and changed its name to Gradient Resources.

[2] Although plaintiffs Steve Munson and Cal Mitchell were originally parties to this appeal, their appeals have been dismissed. We note that Munson—Vulcan's founder who, prior to November 2008, served as Vulcan's chief executive officer (CEO) and the chair of the company's board of directors—was a central player in the facts that gave rise to this action. Although we describe those background facts herein, because his appeal has been dismissed, the claims in the case brought solely by Munson—in particular, the second, eighth, and tenth claims for relief—are not at issue on appeal.

[3] We use the term "institutional investors" to refer collectively to two groups of defendants. The first group of defendants, to which we refer as the "Denham defendants," consists of Denham Capital Management, LP (Denham), a limited partnership with its principal place of business in Massachusetts; Denham Commodity Partners Fund V, LP (Denham Fund V), a Delaware limited partnership created by Denham; and Vulcan Investment Holdings, LLC (Denham Holdings), a Delaware limited liability company formed to invest in Vulcan. The second group of defendants, to which we refer as the "Merrill defendants," consists of Merrill Lynch Commodity Partners, LP (Merrill Partners), a limited partnership with in principal place of business in Texas; ML Energy Partners (ML Energy), a Delaware limited liability company with its principal place of business in Texas; and Valley Energy Investment Fund U.S., LP (Valley Energy), a Delaware limited partnership formed to invest in Vulcan.

to those transactions and further actions taken by Vulcan's management and board of directors.[4] In their complaint, plaintiffs alleged that defendants, acting in concert, had initiated a "fraudulent takeover" of Vulcan and, by various means, "positioned themselves to increase their own stake in [Vulcan's] future success, at the expense of the plaintiffs and other common shareholders."

Specifically, according to plaintiffs' complaint, in 2007 Vulcan was seeking additional capital to finance drilling equipment and expansion of its operations. Accordingly, in early 2007, Vulcan, through its then-CEO and board chair, Steve Munson, entered into agreements with Merrill Partners, represented primarily by David Owens, on both a convertible-debt investment and Vulcan's management and direction going forward. As to the former, Merrill Partners initially invested $35 million in Vulcan in exchange for promissory notes convertible to Vulcan stock and, later, invested an additional $10 million. As to the latter, the negotiations ultimately produced an employment agreement between Vulcan and Munson whereby Vulcan agreed to employ Munson as CEO through March 31, 2013, subject to a provision allowing for termination for cause.

Subsequently, Denham agreed to invest $100 million in Vulcan in exchange for preferred stock.[5] At that time, Merrill Partners also agreed to conversion of its investment in Vulcan to preferred stock. In addition, Denham and Merrill Partners jointly agreed to purchase well over two

---

[4] In particular, the group of "director defendants" is comprised of various individuals associated with either the Denham defendants or the Merrill defendants. That group consists of Scott Mackin, a New Jersey resident appointed by the Denham defendants to serve on Vulcan's board of directors; Robert Warburton, a Massachusetts resident appointed by the Denham defendants to serve on Vulcan's board of directors and, later, to replace Munson as Vulcan's CEO; Todd Bright, a Texas resident appointed by the Denham defendants to serve on Vulcan's board of directors; David Owens, a Texas resident appointed by the Merrill defendants to serve on Vulcan's board of directors; and Robert Jones, a Texas resident appointed by the Merrill defendants to serve on Vulcan's board of directors. Finally, defendant Rod Wimer, who responds individually on appeal, is an Oregon resident who was appointed as a member of Vulcan's board of directors after many of the events that are the subject of this action had already transpired.

[5] As noted, Denham and Denham Fund V eventually created Denham Holdings to make the equity investment in Vulcan.

million shares of Munson's common stock for $15 million. Consequently, in April 2008, Vulcan and the Denham and Merrill defendants, after extensive negotiations in which Owens continued to represent Merrill Partners and Scott Mackin represented Denham, agreed upon a term sheet. The term sheet provided for the aforementioned $100 million investment by Denham, the conversion of Merrill Partner's $45 million investment into preferred stock, and the Denham and Merrill defendants' "right to appoint a minority of the directors of [Vulcan]." According to plaintiffs, the agreement on a term sheet caused Vulcan to cease negotiating with other investors regarding its need for additional capital.

Thereafter, in July 2008, plaintiffs allege that the Denham and Merrill defendants demanded changes to the term sheet consisting of a lesser initial investment by Denham Holdings, a lower stock-conversion price, and the addition of terms allowing the Denham and Merrill defendants to appoint a majority of the directors of Vulcan. By that time, Vulcan had no good alternative to agreeing to those demands because it had discontinued negotiations with other potential investors, had allowed Denham months of funding delays, and had already spent much of its own capital in reliance on the promised $100 million from Denham. Ultimately, after further negotiations between Vulcan and the Denham and Merrill defendants, the parties agreed on the terms of a $145 million investment, which provided for numerous vested warrants and stock options to be issued to Vulcan's shareholders, employees, and directors. During the negotiations, the Denham and Merrill defendants repeatedly assured Vulcan and Munson that they supported Munson's leadership and business plans.

Written agreements were prepared by the Denham and Merrill defendants to finalize the investment transactions and accompanying oral agreements. As relevant here, those agreements consisted of (1) a "Series C Preferred Stock Purchase Agreement" (the SPA), between Vulcan and Denham Holdings and Valley Energy, signed by Munson on behalf of Vulcan; (2) a "Stock Purchase Agreement" (the Munson Agreement), between Vulcan, Munson, Denham Holdings, and Valley Energy, also signed by Munson on behalf

of himself and Vulcan; and (3) an "Amended and Restated Stockholders Agreement" (the Stockholders Agreement), between Vulcan, Denham Holdings, Valley Energy, Munson, and various common stockholders, signed by Munson and Vulcan's largest stockholders, including plaintiffs. However, on July 25, 2008, when the contracts were signed, Munson was out of the country on business for Vulcan. Plaintiffs allege that Mackin, acting on behalf of the institutional investors, told Munson by phone that the agreements were ready for execution and accurately memorialized the parties' oral agreement. Mackin further informed Munson that the agreements were too long to fax and that he would fax Munson the signature pages which, once executed, would be attached to the agreements. However, Mackin informed Munson that, if the agreements did not conform to the already-made oral agreement, "the parties would continue to negotiate in good faith to try to reach agreement on the terms of the transaction, and if they could not reach an agreement, the $5 million" provided by Denham would be treated as a loan. Thus, according to plaintiffs, relying on Mackin's assurances, Munson signed the signature pages without reviewing the written agreements to which they applied. Plaintiffs allege that the same method—faxing only the signature pages—was used to obtain the signatures of Vulcan's "largest shareholders," including plaintiffs George Marshall, Doug Frosch, Soo Min Fay, and Tim Shea.

Ultimately, plaintiffs allege, the written agreements differed significantly from the parties' oral agreements. For example, the agreements "did not acknowledge or contain the full package of warrants and options that were to go to * * * Munson and other Vulcan Power directors, employees, and other common shareholders." Furthermore, the Stockholders Agreement provided that the stockholders agreed that they had not received any issuance of stock options or warrants before the date the agreement was signed and that they released any "claims that they may have had with respect to the issuance of any stock options or warrants before" that date. In addition, each agreement contained a forum-selection clause providing that disputes arising from the agreements would be litigated in New York and that New York law would apply, and that the parties waived

their right to a jury trial.[6] Plaintiffs assert that they did not agree to those provisions and that Munson was rebuffed upon demanding that the agreements be corrected.

After the agreements had been signed and the institutional investors were granted the right to appoint a majority of Vulcan's directors, Mackin and Owens, along with Robert Warburton, Todd Bright, Robert Jones, and Rod Wimer, were appointed to the board. Then, in November 2008, Munson was terminated as CEO and board chairman; he remained a member of the board. Warburton replaced Munson as CEO, and Owens replaced him as chairman of the board. According to plaintiffs, "[a]fter seizing control" of Vulcan, defendants acted to deprive Munson of information in his capacity as a board member, "departed from" the business plan upon which they had previously agreed with Munson, mismanaged Vulcan in order to achieve a "contrived insolvency" that would benefit defendants to the detriment of plaintiffs and other common shareholders, refused to issue promised options and warrants to Vulcan's common shareholders and employees, and approved a $45 million loan from Denham Holdings to Vulcan, which plaintiffs characterize as a "predatory insider transaction" designed to benefit the Denham defendants to the detriment of plaintiffs and Vulcan's other common shareholders.

Based on those allegations, plaintiffs brought a number of claims against defendants, including claims for:

- Oppressive conduct (first claim), brought by all plaintiffs against the institutional investors and the director defendants.

- Breach of fiduciary duty (third claim), brought by all plaintiffs against the institutional investors and the director defendants.

- Acting in concert (fourth claim) brought by all plaintiffs against the institutional investors and the director defendants.

---

[6] The forum-selection clauses contained in the SPA and Munson Agreement provided for exclusive jurisdiction in New York; the Stockholders Agreement, in contrast, contained a nonexclusive New York forum-selection clause.

- Aiding and abetting breach of duty (fifth claim), brought by all plaintiffs against Denham, Merrill Partners, ML Energy, and Denham Fund V.

- Substantial assistance in accomplishing a tortious result (sixth claim), brought by all plaintiffs against Denham Holdings, Valley Energy, and the director defendants.

- Reformation of contract (seventh claim), brought by Munson, Marshall, Frosch, Mitchell, Fay, and Shea, seeking reformation of the SPA, the Munson Agreement, and the Stockholders Agreement.

- Declaratory judgment (ninth claim) brought by all plaintiffs against the institutional investors and the director defendants, seeking a declaration that plaintiffs are entitled to certain vested options and warrants.[7]

In response to plaintiffs' claims, defendants filed a number of motions seeking dismissal pursuant to various provisions of ORCP 21 A. Ultimately, the trial court dismissed the majority of plaintiffs' claims with prejudice for lack of subject matter jurisdiction, lack of personal jurisdiction, or failure to state a claim. In addition, in accordance with an arbitration clause included in Munson's employment agreement, the court also granted Warburton's motion to compel arbitration of plaintiffs' claims that related to Munson's termination.[8] Plaintiffs assign error to those rulings.

## II. REFORMATION CLAIM

We begin by addressing the trial court's dismissal of the reformation claim—the seventh claim for relief alleged in the complaint. Before the trial court, Vulcan moved to

---

[7] As noted, the second, eighth, and tenth claims alleged in the operative complaint were brought by Munson alone, and are not at issue on appeal.

[8] As relevant on appeal, those were the first (oppressive conduct), third (breach of fiduciary duty), fourth (acting in concert), and sixth (substantial assistance) claims. All of those claims were also dismissed pursuant to ORCP 21 A. Warburton's motion did not seek to compel arbitration of plaintiffs' ninth (declaratory judgment) claim. Because, as explained below, we conclude that the trial court properly granted Warburton's and Wimer's motions to dismiss the first, third, fourth, and sixth claims for relief, we need not address plaintiffs' contention that the trial court erred in granting the motion to compel arbitration.

dismiss the reformation claim under ORCP 21 A(1), asserting that the court lacked subject matter jurisdiction over the claim in light of the forum-selection clauses in the three agreements plaintiffs sought to reform. *See Black v. Arizala*, 337 Or 250, 266, 95 P3d 1109 (2004) ("ORCP 21 A(1) authorizes Oregon courts to dismiss an action for lack of jurisdiction over the subject matter when * * * the record demonstrates that the parties have an enforceable agreement to litigate the action in a different venue."). In view of plaintiffs' assertion in the complaint that the forum-selection clauses had been procured by fraud, Vulcan asserted both that (1) the fraud allegation was insufficient because plaintiffs did not "allege that anyone made a representation to them regarding any particular forum for the resolution of disputes or governing law, or that they reasonably relied on any such representation" and (2) that plaintiffs' fraud allegations regarding the forum-selection clauses were "simply false." Defendants filed declarations with attached exhibits to support their position.

Plaintiffs responded that they had adequately alleged fraud with respect to the forum-selection clauses. Further, they filed their own declarations with supporting exhibits to demonstrate that the issue of whether the forum-selection clauses were improperly procured was a "disputed issue of material fact." Because that factual issue was central to the merits of their claim for reformation and its resolution would "constitute a ruling by the court on [a] disputed factual issue," they contended that the court could not properly resolve it on a motion to dismiss. Plaintiffs also asserted that the forum-selection clauses were ambiguous and, therefore, their proper construction could not be resolved on a motion to dismiss. Finally, plaintiffs emphasized that the forum-selection clause in the Stockholders Agreement was nonexclusive and, therefore, in any event, the court had subject matter jurisdiction over claims relating to that agreement, including the claim for reformation of that agreement. Ultimately, the trial court granted Vulcan's motion and dismissed the reformation claim with prejudice on the ground that the court lacked subject matter jurisdiction.

On appeal, in their first assignment of error, plaintiffs assert that the trial court erred in concluding that it

lacked subject matter jurisdiction over the reformation claim. Defendants[9] respond by asserting that plaintiffs' appeal from the dismissal of the reformation claim is moot and, in the alternative, that the court correctly dismissed the claim for lack of subject matter jurisdiction. We address those contentions in turn.

## A. Mootness

With respect to whether the reformation claim is moot, defendants assert that, after the trial court entered the limited judgment at issue in this case, "the same claim, involving these same plaintiffs, [was] conclusively resolved by litigation in New York" and, therefore, "this court's decision on appeal can have no practical effect on the rights of the parties to the reformation claim." In light of that contention, we begin by briefly recounting the New York litigation to which defendants refer.

While this case was pending, Vulcan brought an action in New York against Munson, Marshall, Frosch, Mitchell, Fay, and Shea (the parties who brought the reformation claim in this case) seeking a declaratory judgment.[10] Specifically, Vulcan sought a declaration that the SPA, the Munson Agreement, and the Stockholders Agreement were valid and enforceable. With respect to the SPA and the Munson Agreement, each signed by Munson alone, the court entered an order of default against Munson on the declaratory judgment claim. With respect to the remaining agreement, on summary judgment, the trial court ruled in favor of Vulcan. The court rejected, on the merits, the contentions that the Stockholders Agreement had been procured by fraud and that there had never been a meeting of the minds, and concluded that the parties were bound by the terms of

---

[9] In particular, the brief filed jointly by Vulcan, the Denham defendants, Mackin, Warburton, and Bright addresses the issue of subject matter jurisdiction. Although several briefs have been filed by the various defendants in this case, unless the identity of a particular defendant is pertinent to an argument on appeal, in this opinion, we refer simply to "defendants" when discussing the arguments on appeal.

[10] Although the defendants in the New York case filed a motion to dismiss or stay the proceeding because "there [was] a first-filed action pending in Oregon between the same parties and involving the same subject matter," the court denied the motion.

the agreement. The final judgment was entered by the New York trial court while the instant appeal was pending before this court. That judgment was subsequently upheld by the New York appellate courts. *See Vulcan Power Co. v. Munson*, 932 NYS 2d 68 (NY App Div 2011), *rev den*, 19 NY 3d 807, 973 NE2d 203 (2012).

According to defendants, the New York court's decisions preclude plaintiffs' reformation claim and, for that reason, plaintiffs' appeal is moot. They assert that, "[e]ven if this court were to decide that the trial court had subject matter jurisdiction over the reformation claim, that decision would have no practical effect, because the claim on remand would be" precluded by the New York decisions.

We begin by observing that defendants do not make a true "mootness" argument. "A controversy is justiciable when there is an actual and substantial controversy between parties having adverse legal interests." *Kerr v. Bradbury*, 340 Or 241, 244, 131 P3d 737 (2006) (internal quotation marks omitted). On the other hand, we will dismiss an appeal as moot where there is no longer a controversy and a decision from this court would, thus, "no longer * * * have a practical effect on or concerning the rights of the parties." *Brumnett v. PSRB*, 315 Or 402, 406, 848 P2d 1194 (1993); *see First Commerce of America v. Nimbus Center Assoc.*, 329 Or 199, 206, 986 P2d 556 (1999) (commonly, "an event that may render a case moot occurs during the pendency of the appeal" and an appellate court has the inherent power to consider evidence of such an event to make a determination regarding whether that event moots the case). Defendants' argument here is not so much that there is nothing left for this court to decide with respect to the reformation claim; rather, it is that, if we conclude that the trial court was incorrect to dismiss the case on subject matter jurisdiction grounds and remand the case on that basis, the court will again have to dismiss, this time based on claim preclusion. To address that contention, we would have to consider whether this is an appropriate case for the application of claim preclusion and render a decision on that point. In other words, defendants seek a decision that dismissal of the reformation claim is required, albeit on a different basis. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20

P3d 180 (2001) (describing "right for the wrong" reason principle).

## B. *Right for a different reason*

An appellate court may, as a matter of discretion, "affirm the ruling of a lower court on an alternative basis when certain conditions are met." *Id.* at 659. In particular,

> "[t]he first condition is that, if the question presented is not purely one of law, then the evidentiary record must be sufficient to support the proffered alternative basis for affirmance. That requires: (1) that the facts of record be sufficient to support the alternative basis for affirmance; (2) that the trial court's ruling be consistent with the view of the evidence under the alternative basis for affirmance; and (3) that the record materially be the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below. In other words, even if the record contains evidence sufficient to support an alternative basis for affirmance, if the losing party might have created a *different* record below had the prevailing party raised that issue, and that record could affect the disposition of the issue, then we will not consider the alternative basis for affirmance. The second condition is that the decision of the lower court must be correct for a reason other than that upon which the lower court relied. Third, and finally, the reasons for the lower court's decision must be either (a) erroneous or (b) in the reviewing court's estimation, unnecessary in light of the alternative basis for affirmance."

*Id.* at 659-60 (emphasis in original).

Defendants contend that the judgment of the New York court precludes plaintiffs' reformation claim here because "each of the plaintiffs in the Oregon reformation claim was a defendant in the New York action" and "the New York claim and the Oregon claim are" the same. According to defendants, both claims arise out of the same transaction and involve the same parties, "with one side seeking to affirm [the validity of] the * * * transaction documents, and the other side seeking to reform or invalidate them based on the same allegations of fraud." Plaintiffs, on the other hand, assert that defendants' preclusion argument should not be considered by this court. We agree with plaintiffs.

As we explained in *State ex rel Dewberry v. Kulongoski*, 220 Or App 345, 360, 187 P3d 220 (2008), *aff'd*, 346 Or 260, 210 P3d 884 (2009), the exercise of this court's discretion to affirm a trial court's ruling on an alternative basis "is inappropriate where the record developed below might have developed differently if the alternative basis had been raised." In that case, one party asked us to affirm the trial court's ruling on the basis of claim preclusion due to a federal decision entered after the trial court had ruled. We observed that "[c]laim preclusion is an affirmative defense" and, as such, "it must be pleaded by a defendant" and may "be waived if it is not timely raised." *Id.*; *see also* ORCP 19 B (claim and issue preclusion are affirmative defenses that must be pleaded by a defendant). However, claim preclusion had not been "raised as an affirmative defense in the trial court" and, indeed, "*could not* have been raised because * * * the basis for the * * * claim preclusion argument—*viz.*, the federal court's *subsequent* disposition—did not exist when the present case was in the trial court." *State ex rel Dewberry*, 220 Or App at 360 (emphases in original). Accordingly, the claim preclusion defense was not pleaded and "no record in support of, or in opposition to, that affirmative defense was made, or could have been made, in the trial court." *Id.* Thus, we rejected the proposed alternative basis for affirmance. *Id.*; *see also Fox v. Collins*, 213 Or App 451, 461, 162 P3d 998, *rev den*, 343 Or 223 (2007) (rejecting unpleaded statute of limitations defense as alternative basis for affirmance of trial court's dismissal of claims).

Here, as in *State ex rel Dewberry*, preclusion was not pleaded, nor could it have been given that the New York judgment was entered while this case was on appeal. Furthermore, again as in *State ex rel Dewberry*, because the decision from the New York court was issued while this case was on appeal, no record regarding preclusion was (or could have been) made before the trial court. Under those circumstances, we conclude that it would be inappropriate for us to affirm the trial court's ruling on the proposed alternative basis and, accordingly, we reject defendants' preclusion argument.[11]

---

[11] Because, as explained below, the judgment with respect to the reformation claim must be remanded, defendants will have the opportunity to raise their

## C. *Dismissal for lack of subject matter jurisdiction*

In light of that conclusion, we turn to plaintiffs' contention that the trial court erred in dismissing their reformation claim for lack of subject matter jurisdiction. *See* ORCP 21 A(1) (a party may move to dismiss for "lack of jurisdiction over the subject matter"). Each of the three agreements at issue in this case contains a clause relating to venue.[12] The Stockholders Agreement provides that

> "[e]ach of the parties to this Agreement hereby (a) irrevocably submits to the non-exclusive personal jurisdiction of any New York state or federal court, over any claim arising out of or relating to this Agreement and irrevocably agrees that all such claims may be heard and determined in such New York state or federal court, and (b) irrevocably waives, to the fullest extent permitted by applicable law, any objection it may now or hereafter have to the laying of venue in any proceeding brought in a New York state or federal court * * *."

The SPA and the Munson Agreement each contain identical forum-selection clauses providing for exclusive jurisdiction in New York. Those agreements provide, in part:

> "The parties irrevocably consent to the exclusive jurisdiction of the courts of the State of New York and submit to the jurisdiction of the courts of the State of New York and the federal courts for the Southern District of New York. Each party hereby irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens, which it may now or hereafter have to the bringing of any such action or proceeding in the respective jurisdictions."[13]

(Capitalization omitted.)

---

preclusion arguments before the trial court.

[12] We note that it is unclear from the complaint precisely which defendants the reformation claim is brought against.

[13] The text of the relevant sections of the SPA and the Munson Agreement are as follows:

"Governing Law and Submission to Jurisdiction.

"(a) THIS AGREEMENT, AND ALL OF THE RIGHTS AND DUTIES OF THE PARTIES ARISING FROM OR RELATING IN ANY WAY TO THE SUBJECT MATTER OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY, SHALL BE GOVERNED BY, CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAW PRINCIPLES THEREOF.

Plaintiffs assert that (1) the forum-selection clause in the Stockholders Agreement provides only for nonexclusive jurisdiction in New York and the forum-selection provisions in the SPA and the Munson Agreement are ambiguous; and (2) in concluding that the forum-selection provisions were enforceable and that it, therefore, did not have subject matter jurisdiction, the court deprived plaintiffs of their right to a trial on disputed questions of fact. "We review a trial court's determination that it did not have subject matter jurisdiction over [a] claim for errors of law." *Merten v. Portland General Electric Co.*, 234 Or App 407, 413, 228 P3d 623, *rev den*, 348 Or 669 (2010).

In Oregon, where a court concludes that the parties have a valid and enforceable agreement to litigate the action in a different venue, the court must "dismiss the action in response to a timely motion to dismiss for lack of jurisdiction over the subject matter." *Black*, 337 Or at 264. In evaluating a motion to dismiss on that ground, the trial court has authority to consider the facts alleged in the complaint along with "matters outside the pleading, including affidavits, declarations and other evidence," ORCP 21 A, "regarding [the] venue agreement and whether it is ambiguous." *Black*, 337 Or at 266. However, the court's determination of facts on a motion to dismiss may not "interfere with a party's right to

---

"(b) THE PARTIES IRREVOCABLY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS FOR THE SOUTHERN DISTRICT OF NEW YORK. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH RESPECTIVE JURISDICTIONS.

"(c) Each of the parties hereby irrevocably agrees that service of process may be made on him, her or it by mailing, by certified mail, a copy of such process to such party at his, her or its address for notices specified herein. Each of the parties agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this paragraph shall affect the right of any of the parties to serve legal process in any other manner permitted by law or affect the right of any of the parties to bring any action or proceeding in the courts of any other jurisdictions, domestic or foreign."

(Boldface omitted; capitalization and underlining in original.)

a trial on disputed questions of material fact." *Id.* at 265; *see also* ORCP 21 A (when evaluating jurisdictional facts on a motion to dismiss, the "court may determine the existence or nonexistence of the facts supporting such defense or may defer such determination until further discovery or until a trial on the merits").[14] Thus, when considering a motion to dismiss for lack of subject matter jurisdiction, the trial court may decide disputed jurisdictional facts based on evidence submitted by the parties, but the court may not, at that stage, decide disputed facts that go to the merits of the underlying claim because to do so would deprive a party of its entitlement to a trial "on disputed questions of material fact." *Black*, 337 Or at 265; *see* ORCP 47 C (stating the standard for finding genuine issues of material fact in summary judgment context); *see also State v. West*, 250 Or App 196, 204, 279 P3d 354 (2012) ("Evidence is material if it has a reasonable probability of affecting the outcome of the proceeding." (Internal quotation marks omitted.)); *Black's Law Dictionary* 670 (9th ed 2009) (a material fact is one "that is significant or essential to the issue or matter at hand").[15]

Here, in their claim for reformation, plaintiffs alleged that, "[d]ue to plaintiffs' mistake and fraud and inequitable conduct by defendants, the agreements to which defendants

[14] As noted, under ORCP 21 A, the court may determine the existence or non-existence of jurisdictional facts at the motion to dismiss stage or "*may* defer such determination until further discovery or until a trial on the merits." (Emphasis added.) Thus, the court's decision to determine facts at the motion-to-dismiss stage, rather than deferring such determination until a trial where the parties would have an opportunity to present all their evidence, is subject to review for abuse of discretion. In reviewing for an abuse of discretion, "we consider whether the decision was within a range of legally correct choices and whether it produced a permissible, legally correct outcome." *State v. Worth*, 231 Or App 69, 74, 218 P3d 166 (2009), *rev den*, 347 Or 718 (2010).

[15] We held otherwise prior to *Black*, stating that, "even when the determination of jurisdiction is dependent on resolution of factual issues going to the merits," the trial court could determine those facts on an ORCP 21 motion. *Industrial Leasing Corp. v. Miami Ice Machine Co.*, 126 Or App 80, 84, 867 P2d 548 (1994); *see also Showalter v. Edwards and Associates, Inc.*, 112 Or App 472, 831 P2d 58, *rev den*, 314 Or 391 (1992). However, that reasoning does not survive the Supreme Court's pronouncement in *Black* that, in deciding a motion to dismiss under ORCP 21 A(1) to (7), although the court may "consider whether to dismiss the complaint on the basis of facts drawn both from the complaint and matters outside the pleading," the court must ensure that "its determination of the facts on a motion to dismiss *does not interfere with a party's right to a trial on disputed questions of material fact.*" 337 Or at 265 (emphasis added; internal quotation marks omitted).

attached plaintiffs' signatures did not accurately reflect the parties' agreement." Although plaintiffs "were not guilty of gross negligence" and "reasonably relied upon representations made by defendant that the written documents would accurately reflect the parties' agreement," the agreements (among other things) include clauses providing for venue in New York even though "[p]laintiffs never agreed to those provisions." Accordingly, plaintiffs requested that the documents be reformed to accurately reflect the parties' agreement. *See Jensen v. Miller*, 280 Or 225, 228-29, 570 P2d 375 (1977) ("[A party] seeking reformation of a written contract must establish, by the appropriate quantum of proof, (1) that there was an antecedent agreement to which the contract can be reformed; (2) that there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) that the party seeking reformation was not guilty of gross negligence."). In support of the motion to dismiss, Vulcan filed a declaration with exhibits from its general counsel stating that Munson and his attorney were aware of, and did not object to, the inclusion of the forum-selection clauses in the agreements. Plaintiffs filed a competing affidavit (along with attached exhibits) from Munson declaring that he did not agree to the forum-selection clauses in the agreements, that he informed "representatives of the institutional investors on numerous occasions that Vulcan Power and [he] would not agree to the New York choice of law or forum provisions," and that the contracts to which signature pages were attached nonetheless included the New York forum-selection clauses.

Defendants acknowledge that, "[i]n granting the motion to dismiss, the trial court necessarily found that the forum selection clauses were not procured by fraud." In other words, defendants agree that, in ruling that enforceable forum-selection clauses required litigation in a different forum, the trial court necessarily accepted defendants' proffered version of the facts with respect to the inclusion of the venue clauses in the contracts. The problem with that, however, is that the trial court's determination did not relate simply to the jurisdictional issue but, instead, went to the merits of the reformation claim. As noted, plaintiffs

specifically alleged that the forum-selection clauses were improperly included in the agreements as a result of defendants' misrepresentations and sought to have the agreements reformed on that basis. In rejecting plaintiffs' assertions and concluding that the forum-selection provisions of the agreements were enforceable, the court necessarily resolved disputed issues of material fact on the merits of the reformation claim. That is, in concluding that the agreements were enforceable, the court also rejected the merits of plaintiffs' claim that those clauses should be reformed. As explained, under *Black*, on a motion to dismiss for lack of subject matter jurisdiction, the trial court may decide disputed jurisdictional facts but may not decide disputed facts that go to the merits of the underlying claim. Rather, disputed issues of material fact that are also pertinent to jurisdiction must be decided after the parties have had the opportunity to present all of their evidence on those issues at a trial. *See Black*, 337 Or at 265; ORCP 21 A. Thus, under the circumstances here, the court erred when it granted the motion to dismiss the reformation claim for lack of subject matter jurisdiction, and we must remand on that issue.

## III. PERSONAL JURISDICTION

Before the trial court, the institutional investors and Mackin, Bright, Owens, and Jones (the out-of-state defendants) filed a joint motion under ORCP 21 A(2) to dismiss the claims against them for lack of personal jurisdiction. In support of their contention that the trial court lacked personal jurisdiction over them, the out-of-state defendants filed affidavits discussing, among other things, their roles with respect to Vulcan and their contacts with Oregon. Plaintiffs, in addition to filing a memorandum in opposition to the motion, filed their own affidavits and evidence regarding personal jurisdiction over the out-of-state defendants. The trial court ultimately granted the motion, dismissing all claims against those defendants on the ground that, "in light of the rulings in this order," it would be "unreasonable" for the court to assert jurisdiction over them.[16] The court

---

[16] In its limited judgment, the court specified that

"[a]ll claims asserted by plaintiffs against Defendants Vulcan Investment Holdings LLC, Denham Commodity Partners Fund V LP, Denham Capital Management LP, Valley Energy Investment Fund U.S., L.P., Merrill Lynch

did not make any express factual findings nor did it set forth any additional reasoning in support of its conclusion. Plaintiffs, in their second assignment of error, contend that the trial court erred in determining that it lacked personal jurisdiction over the out-of-state defendants.

Although personal jurisdiction over an out-of-state defendant may be "general" under ORCP 4 A, "specific" under ORCP 4 B to K, or conferred under ORCP 4 L—the "catch-all" provision—plaintiffs here argue for jurisdiction under ORCP 4 L only. *See State ex rel Circus Circus Reno, Inc. v. Pope*, 317 Or 151, 154-56, 854 P2d 461 (1993) (*Circus Circus*) (describing "specific," "general" and "catchall" provisions of ORCP 4). Pursuant to ORCP 4 L, a court of this state has jurisdiction over a party "in any action where prosecution of the action against a defendant in this state is not inconsistent with the Constitution of this state or the Constitution of the United States." That provision permits Oregon courts to exercise jurisdiction over out-of-state defendants to the limits of due process under the federal constitution. *Circus Circus*, 317 Or at 156; *see also id.* ("In determining whether a court may exercise jurisdiction over a defendant under ORCP 4 L, this court is guided by the decisions of the Supreme Court of the United States regarding the constitutionality of such exercise under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.").

The court's inquiry in "determining whether an exercise of jurisdiction over an out-of-state defendant comports with due process" is as follows:

"First, the defendant must have 'minimum contacts' with the forum state. 'Minimum contacts' will be found where the defendant has 'purposefully directed' its activities at residents of the forum state *and* where the litigation 'arises out of or relates to' those activities. *Burger King Corp. v. Rudzewicz*, [471 US 462, 472, 105 S Ct 2174, 85 L Ed 2d 528 (1985)]. Second, even if minimum contacts exist, the exercise of jurisdiction must be reasonable; in light of various factors deemed relevant by the Court, the exercise of

Commodity Partners, L.P., ML Energy Partners, LLC, Scott Mackin, Todd Bright, David Owens, and Rob Jones are dismissed with prejudice on the ground that the court lacks personal jurisdiction over those defendants."

jurisdiction must comport with 'fair play and substantial justice.' *Id.* at 476-77."

*Circus Circus*, 317 Or at 159-60 (emphasis in original); *see Robinson v. Harley-Davidson Motor Co.*, 354 Or 572, 577-78, 316 P3d 287 (2013) ("'[A]n exercise of jurisdiction over a nonresident defendant comports with due process if there exists 'minimum contacts' between the defendant and the forum state such that maintaining suit in the state would 'not offend traditional notions of fair play and substantial justice.''" (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 US 286, 291-92, 100 S Ct 559, 62 L Ed 95 (1945))). Thus, the first step of the analysis involves "a qualitative evaluation of the defendant's contact with the forum state in order to determine whether the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Core-Vent Corp. v. Nobel Industries AB*, 11 F3d 1482, 1485 (9th Cir 1993) (internal quotation marks and citation omitted). Second, the claim must be one that relates to or arises out of the defendant's forum-related activities. Finally, "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp.*, 471 US at 476-77 (quoting *International Shoe Co. v. Washington*, 326 US 310, 320, 66 S Ct 154, 90 L Ed 95 (1945)). "However, 'where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Core-Vent*, 11 F3d at 1487 (quoting *Burger King Corp.*, 471 US at 477). The analyses of minimum contacts and reasonableness are complimentary. *See id.* at 1488 ("minimum contacts and reasonableness factors occupy a sliding scale"). Thus, "'the weaker the plaintiff's showing on [minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of [minimum contacts].'" *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F3d 1086,

1092 (10th Cir 1998) (quoting *Ticketmaster-New York, Inc. v. Alioto*, 26 F3d 201, 210 (1st Cir 1994) (brackets in *OMI Holdings, Inc.*)).

To determine whether the exercise of jurisdiction would be unreasonable, the court examines a number of factors. Those are

> "(1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty with the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum."

*Harris Rutsky & Co. Ins. Serv. v. Bell & Clements Ltd.*, 328 F3d 1122, 1132 (9th Cir 2003); *see Robinson*, 354 Or at 580 ("[A] court must examine whether the exercise of jurisdiction over a foreign defendant comports with fair play and substantial justice, taking into account various factors deemed relevant, including an evaluation of the burden on a defendant, the forum state's interest in obtaining convenient and effective relief, the interstate judicial system's interest in efficient resolution of controversies, and furthering fundamental social policies."). Those factors are to be balanced; no single factor is dispositive. *Harris Rutsky & Co. Ins. Serv.*, 328 F3d at 1132.

Initially, the "[p]laintiff has the burden of alleging and proving facts sufficient to establish personal jurisdiction." *Nike USA, Inc. v. Pro Sports Wear, Inc.*, 208 Or App 531, 533, 145 P3d 321 (2006). "In reviewing a trial court's grant of a motion to dismiss for lack of personal jurisdiction, we assume the truth of all well-pleaded allegations in the record" and "construe pleadings and affidavits liberally to support jurisdiction." *O'Neil v. Martin*, 258 Or App 819, 828, 312 P3d 538 (2013), *rev den*, 355 Or 381 (2014) (internal quotation marks omitted). "However, in determining whether a defendant is subject to the jurisdiction of an Oregon court, courts look to the pleadings and affidavits of both parties." *Nike USA, Inc.*, 208 Or App at 536. "We review the trial

court's factual findings to determine whether they are supported by any competent evidence," and, where the trial court failed to make express factual findings, we assume that the court found the relevant facts in a manner consistent with its ultimate ruling. *Id.* (internal quotation marks omitted). "Once jurisdictional facts are established, we review the determination of personal jurisdiction for legal error." *O'Neil*, 258 Or App at 828.

Here, we begin by observing that the trial court's ruling did not address the issue of minimum contacts. Instead, as noted, the court stated only that it would be "unreasonable for the Court to assert jurisdiction" over the out-of-state defendants in light of the other rulings in its order. Based on that ruling, plaintiffs assert that the trial court apparently concluded that, even though the out-of-state defendants had minimum contacts, the presence of some other factors rendered the exercise of jurisdiction unreasonable. Defendants, on the other hand, assert that the "trial court did not decide whether any of the defendants had the requisite minimum contacts with Oregon that were substantively relevant to plaintiffs' claims to create personal jurisdiction over them." Given the trial court's failure to state its conclusions on the minimum contacts piece of the due process analysis, we are unable to discern whether the court concluded that defendants, indeed, had minimum contacts with Oregon or whether the court simply skipped that step of the analysis altogether. In light of that ambiguity, it is unclear, on review of the court's order, whether or not the facts should be viewed in a manner consistent with a finding that defendants had minimum contacts with the state. That problem is further complicated by the fact that, as described above, minimum contacts and reasonableness factors occupy a sliding scale and are typically evaluated with respect to one another.

Furthermore, the trial court stated that its conclusion that the exercise of jurisdiction would be unreasonable was based on the other rulings in the order. In particular, before the trial court, the out-of-state defendants asserted that the exercise of personal jurisdiction over them would be unreasonable because the forum-selection clauses in the

"investment transaction agreements demonstrate that the parties agreed and irrevocably committed to an alternate forum—New York." Indeed, on appeal, defendants again point out that "[t]he forum selection clauses demonstrate that defendants reasonably did not expect that litigation arising from the 2008 transaction would occur in Oregon." Thus, the other ruling on which the trial court based its decision appears to be the ruling that it lacked subject matter jurisdiction over the reformation claim based on the forum-selection clauses. However, as explained above, the trial court erred in that ruling. Under these circumstances— where it is unclear from the trial court's ruling what factual inferences regarding minimum contacts are appropriate and the underlying ruling on which the court apparently based its conclusion is subject to a remand—we conclude that it is appropriate to remand for the court to reconsider the relevant jurisdictional issues, make any further necessary factual determinations, and clarify its ruling.[17]

## IV. DISMISSAL FOR FAILURE TO STATE A CLAIM

As noted, defendants Warburton and Wimer moved to dismiss plaintiffs' claims against them for failure to state a claim under ORCP 21 A(8). In particular, as relevant on appeal, plaintiffs moved for, and the trial court granted, dismissal of plaintiffs' first (oppression), third (breach of fiduciary duty), fourth (acting in concert), and sixth (substantial assistance) claims for relief.[18] Although Warburton and Wimer made multiple arguments regarding why dismissal of plaintiffs' various claims pursuant to ORCP 21 A(8) was appropriate, the trial court gave no explanation for its rulings.

On appeal, plaintiffs assert that the trial court erred in granting Warburton's and Wimer's motions to dismiss

---

[17] We further note that at least some of the out-of-state defendants were not parties to the agreements containing the forum-selection clauses. As to them, the content of the agreements is immaterial to the analysis of whether it would be unreasonable for Oregon courts to exercise personal jurisdiction over them.

[18] The court also granted Warburton's and Wimer's motions to dismiss plaintiffs' seventh and eighth claims. As noted, the eighth claim for relief was brought by Munson only and is, therefore, not at issue on appeal. As for the seventh claim for relief, plaintiffs' acknowledge that that claim was not made as to Warburton or Wimer and, therefore, do not challenge the trial court's dismissal of the claim as to those defendants. Accordingly, we do not address herein the trial court's dismissal of the seventh and eighth claims for relief against Warburton and Wimer.

their first, third, fourth, and sixth claims for relief. In "reviewing a trial court's ruling on a motion to dismiss for failure to state a claim, we assume the truth of all allegations in plaintiff's pleadings and view all reasonable inferences in the light most favorable to plaintiff." *O'Neil,* 258 Or App at 822-23.

A. *Claims relating to allegations of waste and mismanagement are derivative*

Before the trial court, among other things, Wimer and Warburton asserted that plaintiffs' first, third, fourth, and sixth claims for relief were derivative and were required to be brought on behalf of Vulcan. For that reason, they contended, plaintiffs lacked standing to bring those claims on their own behalf, as they did. On appeal, defendants continue to maintain that the claims at issue are all derivative claims that belong to the corporation and cannot be brought as direct claims by shareholders such as plaintiffs.

We begin by noting that, because Vulcan is a Colorado corporation, we apply Colorado law in determining whether plaintiffs' claims could properly be brought as direct, rather than derivative, claims against the institutional investors and the director defendants.[19] *See Kollman v. Cell Tech International, Inc.,* 250 Or App 163, 172, 279 P3d 324 (2012), *rev den,* 353 Or 410 (2013) (applying Delaware law in evaluating whether action by shareholder in Delaware corporation was derivative); *see also* ORS 60.714(3) (Oregon corporations statutes do "not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state."); William Meade Fletcher, 9 *Fletcher Cyclopedia of the Law of Corporations* § 4223.50, 31-32 (2008) (internal affairs "include those matters that are peculiar to the relationships among or between the corporation and its officers, directors and shareholders").

"[A] derivative action * * * is a mechanism used in the corporate context by shareholders to sue on behalf of a corporation when those in control of a corporation decide not to pursue a claim belonging to the organization." *Curtis v.*

---

[19] Before the trial court, plaintiffs argued, under Colorado law, that their claims were not derivative.

*Nevens*, 31 P3d 146, 151 (Colo 2001). Shareholders may use derivative suits to file an action "in the name of the organization against alleged wrongdoers, naming the board of directors as defendants." *Id.* Corporate shareholders may not, however, "assert individual claims based on wrongs to the corporation where they did not suffer injuries separate and distinct from the injury to other shareholders." *Adams v. Land Services, Inc.*, 194 P3d 429, 434 (Colo App 2008). Rather, shareholders "may sue corporate officers and directors only when they have sustained a loss which is separate and distinct from that of other stockholders"; where the "loss, if any, was to all shareholders," the "right to sue belongs to the corporation and may be brought by individual shareholders only as a derivative action." *Buechner v. Rouse*, 538 P2d 117, 120 (Colo App 1975). Whether a claim is derivative rather than direct in nature is determined by evaluating, from the facts alleged in the complaint, who suffered the alleged harm and who would receive the benefit of a remedy. *Kim v. Grover C. Coors Trust*, 179 P3d 86, 89-90 (Colo App 2007).

Plaintiffs assert that the claims in question allege harm to the common shareholders that is different "from the preferred shareholders (all of whom are made up by defendants)." In particular, plaintiffs point to a number of allegations, which they assert allege "a scheme whereby *preferred* shareholder defendants have acted so as to increase *their* assets and profits while simultaneously harming the interests of *common* shareholder plaintiffs" (emphases in original):

> "'[D]efendants' management [is] taking the company rapidly toward a contrived insolvency that defendants are using to their benefit as * * * preferred shareholders to the detriment of the common shareholders.

> "'[D]efendants have inexplicably failed to follow industry practices * * *. This can only be because they wanted to * * * substitute a new funding mechanism that is more advantageous to the Denham preferred shareholder, and much worse for the * * * common shareholders.

> "'Because the defendants control the company * * *, they can also cause the company to default on Denham defendants' loan so that Denham defendants can convert their

present minority equity ownership in Vulcan to 100% ownership of all its most valuable geothermal assets.

"'The defendants also refused to issue the previously authorized stock options and warrants to the company's common stockholders.

"'It is now apparent that the actions of the defendants * * * were undertaken * * * to ultimately increase the defendants' profits from their investment in Vulcan Power through financial transactions, inside or outside of bankruptcy, that have already occurred and are yet to be seen—all to the benefit of the controlling preferred shareholders and at the expense of the common shareholders.'"

(Internal citations omitted; brackets and ellipses in original.)

Defendants, however, contend that the "anticipated corporate takeover described in plaintiffs' complaint (that is, a plan to dissipate the company's funds so that Vulcan Investment could foreclose on its loan and acquire the company's assets at fire sale prices * * *) would cause all shareholders to suffer the same diminished stock value." Furthermore, the "fact that Vulcan Investment allegedly may benefit *in its role as lender* does not change that result that[,] under plaintiffs' theory, Vulcan Investment also would suffer diminished stock value *in its role as a shareholder.*" (Emphases in original.) To the extent that plaintiffs' claims are related to the alleged waste or mismanagement of Vulcan, we agree with defendants that the resulting harm, if any, would be to the company as a whole, and that any resulting diminution would apply to all stock; thus, waste or mismanagement of the company and its assets would not result in a loss to plaintiffs that is separate and distinct from that of other stockholders.

"In general, claims of waste and mismanagement of corporate assets are claims which allege injury to the corporation and, thus, can only be raised by the corporation itself or by the stockholders in a derivative suit." *River Management Corp. v. Lodge Properties, Inc.*, 829 P2d 398, 403 (Colo App 1991) (citing *Ireland v. Wynkoop*, 36 Colo App 205, 539 P2d 1349 (1975)); *see also Colt v. Mt. Princeton Trout Club, Inc.*, 78 P3d 1115 (Colo App 2003) (discussing derivative claims for shareholder oppression). The facts of

*River Management Corp.* illustrate that principle. In that case, the plaintiff asserted claims related to the waste and mismanagement of corporate assets and asserted that it could bring a direct action because it suffered a distinct injury that was not suffered by other shareholders. In particular, the plaintiff asserted that "the majority directors undertook massive renovations within a very short time period and this allowed [the corporation] to incur an extensive amount of debt. This waste and mismanagement, [the plaintiff argued], deflated [the company's] stock value and thus allowed * * * the majority shareholder to buy all of [the plaintiff's] shares at a depressed value." 829 P2d at 403. The court, however, concluded that "[a]ny impairment of the value of [the company's] stock caused by waste or mismanagement affected all of [the company's] stock, not just [the plaintiff's] shares. Therefore, [the plaintiff] did not suffer a distinct harm." *Id.* The court concluded that the plaintiff could not bring a direct action. *See also id.* at 404 (observing that the "majority of jurisdictions" regard "claims of waste and mismanagement of corporate assets as claims which must be brought in a derivative suit").

In contrast, in *Kim*, the plaintiff brought an action for breach of fiduciary duty against, among others, members of a board of directors of a company in which he held stock. The gravamen of the allegations in the plaintiffs' complaint was that "individuals and trusts related to or associated with [the controlling shareholders] manipulated [a series of transactions] in such a manner as to dilute the value and voting rights of the minority shareholders while simultaneously increasing the ownership and value of their own shares." 179 P3d at 89. Under those circumstances, the court held that the alleged injury was not common to all shareholders and, if he prevailed on the merits of his claim, the plaintiff "would be entitled to damages distinct from damages to the corporation itself." *Id.* at 90.

Here, like in *River Management Corp.*, plaintiffs' claims center on the mismanagement of Vulcan. In particular, plaintiffs assert that defendants removed Munson from his leadership position in the company, that their mismanagement of Vulcan will weaken the company and make it insolvent, that they "failed to follow industry practices,"

and that they can "cause the company to default on Denham defendants' loan so that Denham defendants can" gain ownership of Vulcan's valuable geothermal assets. All of those allegations go to mismanagement of the company. However, the alleged mismanagement, as in *River Management Corp.*, would affect all shareholders in the company. Failure to follow industry practices, taking the company into insolvency, defaulting on loans, and allowing a creditor to gain company assets as a result of such a default, are all actions that affect the value of the company as a whole. Those allegations do not relate to any injury distinct from injury to Vulcan itself and, therefore, the harm is common to all shareholders. As noted, plaintiffs point out that Denham, in particular, stood to benefit from a default on the loan because, under the terms of the loan, it could then gain ownership of company assets. However, any benefit that Denham would receive by a default would be in its role as a lender; as a shareholder, the value of Denham's stock in Vulcan would be affected like that of all other shareholders. Thus, the alleged mismanagement affected all of the company's stock (including Denham's) and not only plaintiffs' and, therefore, plaintiffs cannot raise their mismanagement-related claims directly. To the extent the first, third, fourth, and sixth claims related to that alleged mismanagement, they were properly dismissed as derivative.

B.  *Plaintiffs fail to state a claim relating to the failure to issue options and warrants*

Although the majority of the allegations at issue in plaintiffs' first, third, fourth, and sixth claims for relief relate to plaintiffs' contention that defendants mismanaged Vulcan and are, therefore, derivative as discussed above, there remains a small subset of allegations in the complaint that do not relate to mismanagement. In particular, as noted, plaintiffs allege that before the SPA, the Munson Agreement, and the Stockholders Agreement were signed in July 2008, the parties had agreed to certain stock options and warrants for common shareholders and prior directors.[20] However, the investment documents did not acknowledge the

---

[20] Plaintiffs are common shareholders of Vulcan; one plaintiff is also a former member of Vulcan's board of directors.

package of options and warrants to which the parties had agreed, and defendants denied there was an obligation to provide the options and warrants. Plaintiffs assert that any "claim to promised options and warrants is necessarily *their* claim, not a claim of the corporation. After all, it was not the corporation that was promised the options and warrants, it was the common shareholders." (Emphasis in original.) We agree. To the extent that plaintiffs have a claim for those options and warrants, such a claim would be direct; the loss, if any, was to the plaintiffs who did not receive the promised options and warrants, and a remedy for that alleged harm would be due to the shareholders themselves.

Nonetheless, we agree with defendants that plaintiffs' first, third, fourth, and sixth claims for relief fail to state a claim against Warburton and Wimer with respect to the failure to issue the options and warrants.[21] Under Colorado law, a shareholder in a corporation may bring a claim for relief from oppressive conduct. *See* CRS § 7-114-301(2).[22] Oppressive conduct is

"'burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of the company to the prejudice of some of its members; or a * * * departure from

---

[21] Again, because the relationships between the directors and shareholders are at issue in these claims, we look to Colorado law in evaluating whether plaintiffs' allegations relating to failure to issue stock options and warrants state claims for oppression or breach of fiduciary duty. *See* ORS 60.714(3) (no statutory regulation of the "internal affairs of a foreign corporation"); Fletcher, 9 *Fletcher Cyclopedia* § 4223.50 at 33 (internal affairs "include those matters that are peculiar to the relationships among or between the corporation and its officers, directors and shareholders").

[22] CRS section 7-114-301(2)(b) provides that a corporation may be dissolved in a proceeding by a shareholder if it established that "[t]he directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent." Another statute, CRS section 7-113-301, is a dissenter's rights statute that provides for judicial appraisal of corporate shares. However, before the trial court, plaintiffs agreed that their oppression claim was not brought pursuant to the appraisal statute. We assume for purposes of this discussion that, in an action for oppression, a shareholder may seek equitable remedies short of dissolution of the corporation. *See Tifft v. Stevens*, 162 Or App 62, 78, 987 P2d 1 (1999), *rev den*, 330 Or 331 (2000) (under Oregon statute "a court in equity may dissolve a corporation or order other equitable relief if it finds that those in control of the corporation have acted illegally, oppressively, or fraudulently"); *but see Pueblo Bancorporation v. Lindoe, Inc.*, 37 P3d 492, 496 (Colo App 2002) ("Prior to the enactment of appraisal statutes, the only relief a minority shareholder could seek when the actions of the corporation were oppressive was the dissolution of a corporation.").

the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely.'"

*Polk v. Hergert Land & Cattle Co.*, 5 P3d 402, 404 (Colo App 2000) (brackets omitted; ellipses in *Polk*) (quoting *Jorgensen v. Water Works, Inc.*, 218 Wis 2d 761, 783, 582 NW2d 98, 107 (Wis App 1998)); *see also Colt*, 78 P3d at 1120 ("'[O]ppression should be deemed to arise only when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the [plaintiff's] decision to join the venture.'" (quoting *In re Kemp & Beatley, Inc.*, 64 NY2d 63, 73, 472 NE2d 1173, 1179 (1984)) (brackets in *Colt*)).

In addition, "the director[s] of a corporation and its controlling shareholders owe a fiduciary duty to the remaining stockholders." *River Management Corp.*, 829 P2d at 404. In particular, "[t]he officers, directors, and controlling shareholders of a corporation have a fiduciary duty to act in good faith and in a manner they reasonably believe to be in the best interests of the corporation and all of its shareholders." *Polk*, 5 P3d at 405. Where an officer or director breaches his duty to a party for whom he is a fiduciary and, thereby, causes damages, he may be liable in tort. *See Graphic Directions, Inc. v. Bush*, 862 P2d 1020, 1022 (Colo App 1993) ("In order to recover on a claim for breach of fiduciary duty, a plaintiff must prove: 1) that the defendant was acting as a fiduciary of the plaintiff; 2) that he breached a fiduciary duty to the plaintiff; 3) that the plaintiff incurred damages; and 4) that the defendant's breach of fiduciary duty was the cause of the plaintiff's damages."); *Restatement (Second) of Torts* § 874 comment b (1979) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act."). Conduct that constitutes a breach of fiduciary duty can also amount to oppression. *Colt*, 78 P3d at 1118.

Here, however, plaintiffs' allegations against Warburton and Wimer relating to the stock options and warrants fail to state a claim for oppression or breach of fiduciary duty. Plaintiffs allege that, in 2008, the institutional investors, Vulcan, and Munson agreed that, as part of the investment deal, existing common shareholders of Vulcan would receive certain stock options and prior directors and employees of the

company would receive certain vested warrants. However, the agreements signed by Munson and plaintiffs (of which they received only the signature pages by facsimile) did not acknowledge the stock options for common shareholders and, indeed, acknowledged that they had not received any options or warrants prior to the signing of the contracts and released any claim they may have had with respect to the issuance of options and warrants prior to that date. After the deal documents were signed, Wimer and Warburton were appointed to Vulcan's board and, later, defendants did not issue "the previously authorized stock options and warrants to the company's common shareholders and employees."

Those allegations are simply insufficient to state a claim that Wimer and Warburton, once they were appointed to the board, acted in a manner that was wrongful, displayed a lack of fair dealing or a violation of fair play, failed to act in good faith, or otherwise oppressed or breached their fiduciary duty to plaintiffs. To the extent plaintiffs may have had a claim to any options or warrants, that claim was pursuant to agreements between the institutional investors, Vulcan, and Munson before defendants were directors of the company. Any such agreement, however, is not reflected in the documents memorializing the deal. There is no allegation that Wimer and Warburton participated in any fraudulent conduct with respect to the options or warrants; indeed, plaintiffs expressly excluded Wimer from any allegation of wrongful activity that occurred before he began to serve on the board, and neither Wimer nor Warburton is alleged to have been on the board or an agent of any defendant at the time when the options and warrants were allegedly promised.[23]

---

[23] Plaintiffs' general allegations that defendants were all agents of one another, that Wimer and Warburton were agents of Denham, and the defendants "knew of the acts of each of the other defendants and accepted the benefits flowing from the acts with full knowledge of all material facts, and therefore ratified each of the wrongful acts of each other defendant that are alleged in this lawsuit" are insufficient to save their claims. *See Fearing v. Bucher,* 328 Or 367, 375 n 5, 977 P2d 1163 (1999) (a complaint does not state a claim through mere conclusions of law; that is, a mere "judgment about a particular set of circumstances [which] assumes facts that may or may not have been pleaded"); *Bernards v. Summit Real Estate Management, Inc.,* 229 Or App 357, 368, 213 P3d 1 (2009) (a complaint must allege ultimate facts from which the required conclusions are *"inferable,* not a mere possibility" and an "inferable conclusion is more than a suspicion, a suggestion, a speculation, or a conjecture; a conclusion is inferable from facts if the conclusion can be logically deduced from the facts" (emphasis in original)).

Taking into account all of the allegations in the pleadings, viewed in the manner most favorable to plaintiffs, the allegations with respect to the options and warrants simply do not state a claim against Wimer or Warburton for oppression or breach of fiduciary duty.[24] And, for the same reasons, plaintiffs' allegations relating to the failure to issue options and warrants fail to state claims for "acting in concert" or "substantial assistance" under the fourth and sixth claims for relief. *See Restatement* at § 876 (a), (c) (one is subject to liability for harm resulting from tortuous conduct of another if one "does a tortious act in concert with the other or pursuant to a common design with him" or "gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty" (boldface omitted)). Accordingly, the trial court did not err in dismissing the first, third, fourth, and sixth claims for relief against Wimer and Warburton for failure to state a claim under ORCP 21 A(8).[25]

## V. DISMISSAL WITH PREJUDICE

Finally, plaintiffs assert that the trial court erred when it ordered dismissal of their claims with prejudice.[26] "The decision to dismiss a case with or without prejudice is within the discretion of the trial judge, and we review only for manifest abuse of that discretion." *Bernard v. Gary J. Lekas, P.C.*, 124 Or App 416, 418, 862 P2d 564 (1993). "Under that standard, we will affirm the court unless its decision is not within the range of lawful alternatives." *Gilbert v. Stancorp Financial Group Inc.*, 233 Or App 57, 61, 225 P3d 71 (2009), *rev den*, 348 Or 218 (2010). Here, we conclude that the trial court did not abuse its discretion.

The case had gone on for some time before the court entered the limited judgment. Munson filed an initial complaint

---

[24] We note that, in the event plaintiffs obtain relief on their reformation claim, they may have a claim for breach of contract for the failure to issue stock options and warrants.

[25] As noted above, in light of this conclusion, we need not address plaintiffs' contention that the court erred in granting the motion to compel arbitration.

[26] Because we are remanding with respect to the jurisdictional issues, we do not address the parties' arguments with respect to those rulings here. Accordingly, we address only the court's dismissal of the claims against Warburton and Wimer.

and, before defendants responded, filed an amended complaint in which additional plaintiffs were added and which, among other things, purported to bring a number of derivative claims against defendants. Defendants moved to dismiss the first amended complaint, and motions were also filed, among other things, to form a special litigation committee to evaluate the derivative claims. Plaintiffs later filed a second amended complaint, abandoning their derivative claims and, instead, as discussed above, bringing direct claims. Defendants again moved to dismiss plaintiffs' claims for the reasons discussed above. As noted, the claims at issue in the ORCP 21 A(8) motion by Warburton and Wimer are, for the most part, derivative and cannot be brought directly by plaintiffs. Furthermore, although they asked the trial court to dismiss their claims without prejudice, plaintiffs had not presented the court with a proposed amended complaint setting out the fourth iteration of their claims nor had they otherwise indicated to the court how they would replead their claims if permitted. By the time the trial court ruled on the motions to dismiss, the record was thousands of pages in length. Under the circumstances here, in light of the procedural history of this case, we cannot conclude that the trial court's decision to dismiss with prejudice the claims against Warburton and Wimer was outside the range of lawful alternatives available to the court and, therefore, the court did not abuse its discretion in doing so.

## VI.  CONCLUSION

For the reasons explained above, the trial court erred in granting the motion to dismiss the reformation claim for lack of subject matter jurisdiction on the basis of facts that went to the merits of the underlying claim. In addition, we remand the trial court's ruling on personal jurisdiction for the court to reconsider the relevant jurisdictional issues, make any further necessary factual determinations, and clarify its ruling. We conclude, however, that the trial court did not err in granting Warburton's and Wimer's ORCP 21 A(8) motions and that it did not err to the extent that it dismissed the claims at issue in those motions with prejudice.

Vacated, in part, and remanded for proceedings consistent with this opinion.